# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### July 12, 2011 Session

## CLARENCE NESBIT v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Shelby County**
**No. P-21818     Chris Craft, Judge**

---

**No. W2009-02101-CCA-R3-PD  -  Filed March 28, 2013**

---

Petitioner, Clarence Nesbit, was convicted by a Shelby County Criminal Court jury of first degree murder and sentenced to death.  He sought post-conviction relief, and the post-conviction court vacated the death sentence and granted a new sentencing hearing, which the State has not appealed.  The post-conviction court denied Petitioner relief from his first degree murder conviction.  On appeal, Petitioner contends that the post-conviction court erred by denying his claim that he received the ineffective assistance of counsel during the guilt phase of the trial.  We affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which NORMA MCGEE OGLE, J., joined.  JOSEPH M. TIPTON, P.J., filed a dissenting opinion.

Marty B. McAfee and Gerald Skahan, Memphis, Tennessee, for the appellant, Clarence Nesbit.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Assistant Attorney General; and Amy P. Weirich, District Attorney General; and John Campbell, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

Petitioner, Clarence Nesbit, was convicted of premeditated first degree murder for the May 1993 death of Miriam Cannon.  At the sentencing hearing, the jury found one aggravating circumstance: "the murder was especially heinous, atrocious or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death."  Tenn. Code Ann. § 39-13-204(i)(5) (1991).  The jury also found that the aggravating circumstance

outweighed the mitigating circumstances beyond a reasonable doubt and imposed a sentence of death. On appeal, the Tennessee Supreme Court affirmed Petitioner's conviction and sentence. See State v. Nesbit, 978 S.W.2d 872 (Tenn. 1998).

The evidence presented during Petitioner's trial was summarized by the Tennessee Supreme Court as follows:

It is undisputed that the nineteen-year-old defendant, Clarence Nesbit, killed the twenty-year-old victim, Miriam Cannon, by shooting her once in the head on the afternoon of May 20, 1993. While Nesbit admitted that he shot the victim, he claimed that the shooting had been an accident.

The proof introduced at the guilt phase of this trial established that the victim lived with her five young children at the Pershing Apartments in Memphis, Tennessee. She had known the defendant for approximately one month prior to her killing. The victim's sister, Constance Cannon, testified that around 1:00 p.m. on the day of the murder, she and a friend stopped by the victim's apartment to drive the victim to the grocery store. Although Cannon knocked at the door for several minutes, no one answered. As they were leaving, Cannon's friend noticed one of the victim's children looking out the window. By the time Cannon returned to the door, the victim had opened it. The victim told Cannon that she was not ready to go and asked Cannon to return at 3:00 p.m. Contrary to her usual practice, the victim did not ask Cannon to come inside. Nonetheless, from the back door, Cannon saw the defendant sitting on the living room couch with one of the victim's children. Cannon had seen the defendant once before the day of the murder, but knew him only by the nickname "Red." Cannon recalled that the victim had been barefoot on the day of the murder, although otherwise clothed. Cannon also recalled seeing a horizontal mark on the victim's neck that she had not seen the day before the murder. Cannon left, as the victim requested, but later telephoned the victim around 3:00 p.m. to confirm their plans. Upon receiving no answer, Cannon assumed the victim had made other arrangements and did not return to her sister's apartment.

James Shaw, a boyfriend of the defendant's aunt, lived in the victim's apartment complex. Shaw testified that he had been sitting outside his apartment on the afternoon of the murder when he heard a gunshot in a nearby apartment unit. Shortly afterward, Shaw saw the defendant leave the area from which the gunshot had sounded, casually walk to his car, a blue Oldsmobile, and drive away from the apartment complex at a normal rate

-2-

of speed. Shaw described the defendant's behavior as normal, except for the "funny look" Shaw had observed in the defendant's eyes. Shortly after the defendant departed, Shaw saw the victim's children crying in the parking lot of the complex. When Shaw inquired about their mother, one of the children responded, "She's dead."

Tracy Davis, the victim's close friend and neighbor, testified that on the day of the murder she had heard children crying in the victim's apartment and had seen three of the victim's children walking toward her apartment. The children told Davis that their mother was asleep and could not be woken. As a result, Davis went to the victim's apartment and found the victim lying in a pool of blood in front of the kitchen door. The victim's youngest child was on the floor beside her mother trying to wake her. Davis returned to her apartment and called the police.

When the police arrived, they first spoke with the victim's children who told them that "Red" had shot their mother. "Red" was one of the defendant's nicknames. When the police entered the victim's apartment, they found her body lying face up, fully clothed, with sandals on her feet. Next to her body police found a cigarette butt, a match, a book of matches, and a hair barrette. Four cartridges were found on top of the refrigerator and a lead bullet fragment on the kitchen floor at the door to the living room. A hot curling iron lay on the kitchen counter. A ricochet mark made by a bullet was found approximately 4'8" above the ground on the wall behind the stove.

Dr. O.C. Smith, assistant medical examiner for Shelby County, performed the autopsy on the victim. Dr. Smith testified that the victim had died from a single gunshot wound to her head. Dr. Smith opined that the gun inflicting the wound had been approximately twelve to thirty-six inches from the victim's head when it was fired. The bullet entered the victim's body through her left ear, about 5'0" above the floor, traveled in a downward trajectory through the victim's skull and brain, and exited behind her right ear at a height of 4'11" above the floor. According to Dr. Smith, the gunshot wound would have instantly incapacitated the victim.

Dr. Smith also had observed burns on the victim's chin, neck, abdomen, and forearm. The burns had been inflicted at various points in time from six hours to mere minutes before the victim had died. Dr. Smith described the burn on the left side of the victim's neck as in the shape of the

-3-

numeral one ("1"). Upon viewing photographs of the victim's body, Constance Cannon testified that the horizontal bar at the base of that burn appeared to be the mark she had seen on her sister's neck the afternoon of the murder. Dr. Smith testified that soot and blistering on another triangular burn under the victim's chin indicated that it had been caused by an open flame. Although the other burns had also been thermal in origin, Dr. Smith could not identify the precise cause of those burns.

Dr. Smith also found bruising and scraping on the soles of the victim's feet during the autopsy. He opined that these injuries had been caused by striking the victim's feet with a long, hard, thin object such as a rod or a coat hanger. Dr. Smith found no defensive wounds on the victim's body.

With respect to the defendant's actions on the day of the murder, the proof showed that, after the shooting, Nesbit left the Pershing Apartments and drove to the Royal Oaks Motel, where his uncle Ashley Nesbit, had a room. Once there, he spoke privately with his uncle, and hid the murder weapon, a .357 Magnum revolver, in the bathroom of the motel room. After the victim's body had been found the defendant returned to the Pershing Apartments in his cousin's green pickup truck. The defendant encountered James Shaw and told him that the victim had shot herself while playing Russian Roulette. Upon Shaw's advice to tell the truth, Nesbit admitted to Shaw that he shot the victim, but claimed it was an accident. The defendant also told Shaw that he had left the gun at the motel. Shaw and the defendant were preparing to drive out of the apartment complex to retrieve the gun when police stopped their vehicle and apprehended the defendant. A search of the defendant's person revealed a beeper and $602 in cash. With police permission Shaw proceeded to the motel, retrieved the gun, and surrendered it to police.

In the meantime, the defendant was interrogated by police and stated that he spent the night before the killing at the victim's apartment. At first, Nesbit told police that the victim had been "playing" with the gun when it discharged and killed her. Later, the defendant related that he accidentally shot the victim, claiming that he had pulled the trigger believing the gun to be unloaded.

At trial, Nesbit testified that he had been visiting his uncle's motel room on the night before the killing when police officers arrived at the

-4-

motel and began a search of the premises. Observing a gun on the dresser, Nesbit removed it from the room before the search and placed it under the seat of his car. After receiving a message from the victim on his beeper, Nesbit went to her apartment, arriving at approximately 3:00 a.m. Nesbit carried the gun inside, removed the bullets, and placed them on top of the refrigerator. He and the victim talked for [a while] before he fell asleep on the living room sofa. Nesbit awoke at 10:00 a.m on the day of the murder and talked to the victim until her sister arrived at 1:00 p.m. Nesbit heard the victim tell her sister to come back at 3:00 p.m. and was preparing to leave in anticipation of Cannon's arrival when the shooting occurred.

According to Nesbit, he had retrieved the gun from the refrigerator and was holding it as he looked outside through the blinds covering the window next to the kitchen door. As he turned away from the window, he held the gun in both hands and pointed it sideways to his left. As he "fumbled" with the gun, it discharged. According to Nesbit, the victim, who was standing to his left, was hit by the bullet when the pistol accidentally discharged. The defendant said that he panicked and left the apartment. Nesbit admitted that his route of departure through the front door had taken him past the victim's dead body and allowed him to retrieve his cap from the sofa. Nesbit did not call for emergency assistance even though he knew that he was leaving four young children in an apartment with their mother's dead body. The defendant denied inflicting the burn and bruise injuries upon the victim.

On cross-examination, the State attempted to emphasize the inconsistencies between Nesbit's several pretrial statements and his trial testimony. The State also elicited an admission from Nesbit that he had been alone with the victim and her children on the day of the murder. Based upon the proof summarized above, the jury found the defendant guilty of premeditated first degree murder. The trial proceeded to the sentencing phase.

The State relied upon the evidence presented during the guilt phase of the trial and, in addition, recalled Dr. Smith to testify about the burns and the bruises found on the victim's body. Dr. Smith again stated that these injuries were inflicted as long as six hours, or as little as mere minutes before the victim's death. He said the burns on the victim's body ranged from severe first degree to moderate second degree burns and were comparable to a severe sunburn or scald burns caused by touching

-5-

something hot. Dr. Smith opined that the victim would have suffered "moderate" pain from the individual burns.

According to Dr. Smith, the scrapes and bruises found on the victim's feet were consistent with a relatively rare type of torture called "falanga," which involves forcefully striking the soles of a person's feet with a rod or some similar instrument, and which typically is inflicted in a military context, and, to a lesser extent, in child abuse cases. While none of these injuries were severe enough to require hospitalization, Dr. Smith said that the amount of force necessary to cause bruising on the soles of a person's feet could cause "great pain," and if applied to any other part of the body, such force would be sufficient to break the skin. With respect to both the burns and the bruises, Dr. Smith testified that the victim would have suffered a great deal of distress anticipating the injuries since they had been inflicted over an extended period of time. Although Dr. Smith found no marks on the victim's body indicating that she had been restrained, he opined that soft ligatures would have left no marks. Additionally, he stated that the victim might have been restrained by mental intimidation. Dr. Smith found no defensive wounds on the victim's body and no signs of sexual assault or activity. Finally, the doctor opined that torture is not ordinarily inflicted to produce death.

The only other witness for the State was the victim's mother who described the impact of the victim's death on her family, including her parents and siblings and particularly the victim's children.

In mitigation, the defendant presented proof that he had participated in the Shelby County Jail choir. Nesbit's brother and sister asked the jury to spare the defendant's life and testified that he is a nice, kind brother who previously had given them good advice and helped them to correct mistakes they had made. The defendant's mother and grandmother testified Nesbit had been a good, kind, and well-behaved person. They described him as an honest and sincere young man who always told the truth and followed the right path. Nesbit had dropped out of school in the tenth grade and moved to Nashville to care for his grandmother who had been experiencing health problems. While there, he had obtained several jobs to assist his grandmother in meeting her financial obligations. Both the defendant's mother and grandmother asked the jury to spare the defendant's life.

Testifying in his own behalf, Nesbit, nineteen-years old when the offense had been committed, told the jury of his plans to improve himself and expressed remorse for what had happened. While the defendant admitted to having a juvenile record for trespass, driving on a revoked license, and assault, he explained the circumstances of those convictions and minimized his criminal culpability for each one. The defendant had no adult criminal record. Nesbit also related that he had dropped out of school in the tenth grade to care for his grandmother who lived in Nashville. Nesbit had not been steadily employed at the time of the killing, but he explained that the $602 found on his person when he had been arrested consisted of money he had saved or had been given.

Nesbit, 978 S.W.2d at 877-80.

## POST-CONVICTION PROCEEDINGS

The trial court appointed the Shelby County Public Defender's Office to represent Petitioner at the trial. The original counsel and co-counsel assigned to Petitioner's case left the Shelby County Public Defender's Office before the trial. Petitioner's case was reassigned within the Public Defender's Office to trial counsel and co-counsel.

Original counsel testified that he was assigned to the capital defense team of the Shelby County Public Defender's Office in January or February 1993. In August 1993, he and co-counsel were assigned to represent Petitioner. Counsel said he and Elizabeth Benson, the social worker assigned to the case, performed an initial intake investigation during which they interviewed Petitioner on September 2, 1993. Counsel said he also filed numerous motions that were routinely filed in capital cases. He stated that he accepted employment as a prosecutor in the Shelby County District Attorney General's Office and ended his representation of Petitioner.

On cross-examination, counsel testified that Petitioner claimed the shooting was accidental and that Petitioner said he forgot he had the gun with him the night before the shooting. Counsel said Petitioner told him that once he realized he had the gun, he took the gun inside the victim's apartment, unloaded it, and placed it on either the refrigerator or in a cabinet. Petitioner told him that he picked up the gun and, without realizing it was loaded, pointed it at the victim and pulled the trigger. Petitioner told counsel that he, the victim, and the victim's small children were the only people in the apartment when the shooting occurred. Counsel said Petitioner showed no indication of mental problems at the time of the interview.

-7-

Trial counsel was hired as an Assistant District Public Defender in 1982 and was assigned to the capital defense team from 1993 to 1995. Counsel tried at least fifteen murder cases before 1993, including four or five first degree murder cases. While on the capital defense team, he had tried seven or eight capital murder cases.

Counsel testified that an intake interview was an initial task performed when assigned to a capital case. During intake interviews, trial counsel, the investigator, and the social worker obtained the client's social history and signatures on release forms for any hospital or education records. He said he routinely requested that the investigator or social worker contact the client's family members and keep them informed about the case.

Counsel testified that original counsel filed all pretrial motions, which consisted of preprinted forms that the public defender's office filed in all capital cases. He said he did not file any additional motions after he reviewed the discovery materials. He said that although he did not file a motion seeking impeaching information about Petitioner, he received information from the State that Petitioner may have been involved in satanic worship. He said the information was the type that should be kept from the jury, but he acknowledged he did not file a motion in limine. He stated that at the trial, a jury-out hearing was held on this issue. He said he requested from the State any information about Petitioner and was given Petitioner's criminal history. The records showed that Petitioner had a juvenile record for criminal trespass, assault, and false use of automobile license plates and titles but that he had no convictions. He acknowledged it did not appear that Petitioner was familiar with the criminal system.

Counsel testified that on November 23, 1993, he received an offer of twenty-five years' confinement. He said, however, that he did not tell Petitioner about the offer until January 5, 1994, the day before the offer expired. He said that according to his time sheets, he recorded fifteen minutes out-of-court time on Petitioner's case on January 5, 1994. After Petitioner refused to accept the offer, the State revoked it the next day in court and filed a notice on May 13, 1994, of its intent to seek the death penalty.

Counsel testified that he met with Dr. O.C. Smith, the medical examiner, on May 12, 1994. He was in a number of cases involving Dr. Smith and had interviewed and cross-examined him on prior occasions. At their meeting, Dr. Smith told counsel his opinions on the gunshot wound, burns on the victim's body, and bruises on the victim's feet. Counsel was given photographs of the victim's injuries. Dr. Smith referred to "falanga" when he described the wounds on the victim's feet. Counsel said that he did not seek ex parte funds for a forensic pathologist to review Dr. Smith's conclusions because he believed Dr. Smith's "explanation of the situation . . . wasn't absurd [and] was within the realm of what

-8-

happened." He agreed that he did not have training in forensic pathology and that Petitioner denied burning or beating the victim.

Counsel testified that Dr. Smith explained that the injuries to the victim's feet were consistent with falanga, "something like the prisoners of war had . . . people were beaten on their feet." He said Dr. Smith described the practice as "something that happened in foreign countries." He stated that his investigation did not show Petitioner was exposed to or had knowledge about torture in foreign countries.

Counsel testified that he did not have Petitioner evaluated by a mental health expert. He recalled that although Petitioner had academic deficiencies, Petitioner was able to communicate and explain what happened the day of the shooting. He obtained Petitioner's medical records, which showed that Petitioner suffered a seizure on April 4, 1993, and said the records would have been relevant in both the guilt and penalty phases.

Counsel testified that the State provided him with information that Petitioner was involved in satanic worship. He said that Petitioner's case was around the same time as the highly publicized West Memphis, Arkansas killings that involved satanic worship. He agreed this was damaging information. He said that before the trial, he interviewed James Shaw, who told him that he heard the satanic worship allegation but that he had no personal knowledge of it. He agreed he did not file a pretrial motion seeking to exclude the mentioning of satanic worship.

Counsel testified that he believed he had done everything possible to investigate and prepare for the guilt phase of the trial and that he thought he had interviewed every witness that needed to be interviewed. He stated that the victim's sister was the State's first witness at the trial but that he did not interview her before the trial. He said that he first learned that the victim's sister and Valencia Miller saw the victim at the victim's apartment the day of the shooting when the victim's sister testified at the trial. He said that Ms. Miller was not interviewed and that it would have been important to interview someone who saw the victim and Petitioner hours before the victim died.

Counsel testified that he planned to make Petitioner's character an issue at the trial. He said the first mention of satanic worship occurred during his cross-examination of Mr. Shaw. During a jury-out hearing, the trial court ruled that counsel "opened the door" to allow the State to ask Mr. Shaw if he had heard that Petitioner was involved in satanic worship. He said that although he believed that such questioning would not be permitted, the trial court ruled otherwise. He said that the testimony was damaging and that he was not prepared to refute the allegation of satanic worship. He acknowledged evidence that

Petitioner attended church regularly could have aided in refuting the allegation of satanic worship.

Counsel testified that he relied on Petitioner to identify witnesses who needed to be interviewed. He said that when he asked Petitioner about former girlfriends, Petitioner told him about one former girlfriend who had moved, but he did not know her address. He said Tracey Davis, the neighbor who found the victim, was not interviewed before the trial. The defense team's legal investigator interviewed Tracey Davis on February 21, 1995, during the trial. He recalled the defense team attempted to locate Ms. Davis on several occasions before the trial. He said that when Tyrone Cole was interviewed on May 11, 1994, Mr. Cole denied having any information about the shooting. Mr. Cole stated that Petitioner went into the bathroom of the hotel to talk to his cousin but that Mr. Cole did not hear the conversation.

Counsel testified that the defense team did not interview Memphis Police Officer Don Wright but was provided his statement. He said that although he did not question Officer Wright at the trial about Petitioner's cooperation with the police, he thought Petitioner's cooperation was apparent. The defense team also did not interview Memphis Police Officer Martha Mack. He said that although he did not question Officer Mack at the trial about Petitioner and Mr. Shaw's attempt to retrieve the gun and return it to the scene, the information was provided by other witnesses. He said that Memphis Police Officers Timothy Cook and Samuel Williams took Petitioner's statement but were not interviewed before the trial and that evidence of Petitioner's cooperation was not explored at the trial. He said he attempted to interview the victim's children but was not permitted to do so. He said that he spent five or six hours with Petitioner preparing for his trial testimony and that he believed Petitioner was prepared.

Counsel testified that an unused cigarette and unlit match were found beside the victim's body. He agreed that the evidence was consistent with a person's preparing to light a cigarette and that he could have argued that Petitioner would not have allowed the victim to light a cigarette if she were being tortured. He also agreed that such evidence and argument could have given credibility to Petitioner's theory of an accidental shooting.

Counsel testified that although a curling iron was found at the scene, the defense team did not attempt to locate and interview witnesses about whether the victim had a history of burning herself with a curling iron. He agreed Dr. Smith testified at the trial that the victim's injuries took approximately two hours to inflict. He said that he did not attempt to locate witnesses who saw the victim and Petitioner two hours before the victim's death but that this information would have been important. He said the defense team did not interview witnesses who stated that the victim's feet hung over the back of her clogs when she walked. He agreed information that the victim's wearing shoes that caused her feet to hang off the

-10-

back edge and "clip-clopped" when she walked would have been relevant to the bruises on the bottom of her feet. He said that had he known this information, he would have presented it to the jury. He said the defense team did not interview witnesses about the victim's drug use.

Counsel testified that he did not file motions regarding the jury instructions. He was unable to recall if he requested a criminally negligent homicide instruction or objected to the burden of proof instruction. He did not request an instruction on ignorance or mistake of fact but said he did not think ignorance or mistake of fact applied.

On cross-examination, counsel testified that he first interviewed Petitioner on October 27, 1993, and asked Petitioner about his background. He reviewed the State's discovery with Petitioner, including his two statements to the police. He said he asked Petitioner for information on potential witnesses. He said that Petitioner wanted to testify at the trial and that he believed Petitioner needed to testify in order for the jury to believe the shooting was accidental.

Counsel testified that he did not convey the twenty-five-year plea offer immediately because he was preparing for another capital murder trial which was followed by the holidays. He said that he discussed with Petitioner the possible outcomes, including the possibility of a plea agreement. Petitioner told counsel that he was not guilty and would not agree to plead guilty. He said Petitioner rejected the offer because the shooting was accidental. The following day at Petitioner's next court appearance, counsel discussed the offer with Petitioner again, and Petitioner refused to accept it. The State withdrew all offers after learning of Petitioner's rejection. He said that after Petitioner learned that notice of intent to seek the death penalty was filed, Petitioner wanted to accept the twenty-five-year offer. He attempted to negotiate a twenty-five-year plea agreement with the State, but he was only able to obtain an offer of life imprisonment.

Counsel testified that based upon his review of Petitioner's medical records and his conversations with Petitioner, he had no indication that Petitioner suffered from a mental disease or defect. Petitioner's family members did not tell counsel that Petitioner suffered from a mental disease or defect. He said he believed Petitioner understood the charges and could assist him in the defense. Petitioner never told counsel that he blacked out and had no memory following a seizure in April 1993.

Counsel testified that by presenting evidence that Petitioner cooperated with the police, he could have opened the door to rebuttal testimony that Petitioner was trying to manipulate the police by giving them false versions of how the shooting occurred. He agreed that had he introduced the unlit match and unused cigarette found near the victim's body, the

same evidence could have been used to support the State's theory of torture. He stated that by introducing evidence that Petitioner was a good Christian, he could have reopened the door to allow the State to present evidence of the satanic worship allegation. He said Petitioner did not give him the name of a pastor or witnesses with whom he attended church. He said he did not recall Petitioner's identifying Constance Branch as a witness. He noted that even if he had known about Ms. Branch at the time of the trial, he may not have used her as a witness because although she was Petitioner's girlfriend, Petitioner also had a child with another girlfriend. He said that some people could have been offended by those facts. He said Petitioner also did not tell him that the victim used drugs.

Counsel testified that he interviewed Dr. Smith before the trial. He said he did not obtain an independent expert because the defense theory was that Petitioner shot the victim but did not torture her. He said that if he could have had the jury visualize an accidental shooting and agree that Petitioner only shot the victim, the forensic evidence about torture was moot. He agreed that his time sheets did not show his interviewing Dr. Smith before the trial and said that it was not uncommon for the time log not to show all the work he did on a case.

Counsel testified that although he did not ask for a jury instruction on mistake of fact or ignorance, he did not think either applied to the case at the time. The trial court interjected that Petitioner claimed that he thought that the gun was unloaded and that mistake of fact or ignorance could have been a possible theory, which would have made Petitioner's actions a lesser included offense.

Counsel testified that the only person for whom he looked at Pershing Apartments was Tracey Davis. He said the defense team unsuccessfully looked for her before the trial. He interviewed Ms. Davis the day she testified at the trial, and she gave counsel the same information to which she testified. Ms. Davis testified at the trial that she found the victim's children crying and that one of the victim's children said that Petitioner "killed my mama" or something similar.

On redirect examination, counsel testified that his file did not indicate that every witness on the State's witness list was interviewed by the defense team. He said it was possible that the bullets found on top of the refrigerator would have supported a mistake of fact or ignorance jury instruction. He agreed Petitioner was mistaken by believing the gun was unloaded.

Counsel testified that Petitioner decided that he wanted to enter a plea agreement for twenty-five years' confinement at the time of the trial and that he attempted to negotiate a plea with the District Attorney General at that time, but the time sheet showed this meeting

occurred on January 12, 1994. The trial began in May 1995. Counsel disagreed that had he told Petitioner about the twenty-five-year offer before January 6, 1994, Petitioner possibly would have accepted the offer before it was revoked. He did not know the amount of time Petitioner needed to consider the offer. Upon questioning by the trial court, counsel testified that he did not know why the twenty-five-year plea offer was revoked.

On further redirect examination, counsel testified that his initial intake form showed Petitioner was a member of Christ Baptist Church in Frayser but that he was unsure if this information was investigated. He thought the trial court would have refused to admit the satanic worship allegation into evidence, but agreed he did not rebut the satanic worship testimony with Petitioner's church affiliation and participation. He said he did not highlight the unlit match and unused cigarette because if the jury thought the victim did not smoke, the evidence would have been damaging to Petitioner. He admitted that he did not ask witnesses if the victim smoked cigarettes and that the information could have been important.

Original co-counsel testified that she served as second chair before leaving the Shelby County Public Defender's Office in November 1994. At the time she was assigned to Petitioner's case, she had represented capital defendants since 1989. She did not interview witnesses and did not recall visiting Petitioner at the jail, but she recalled accompanying trial counsel to interview Dr. Smith. She said Dr. Smith discussed the burns on the back of the victim's neck and the injuries to the bottom of her feet. She said that based on Dr. Smith's conclusions, she believed an independent forensic pathologist was unnecessary because an independent expert could have only testified about whether the victim was tortured. She stated that if an independent forensic pathologist had testified that the victim was not burned the way Dr. Smith concluded, it would have made a difference in Petitioner's case. She agreed that the decision regarding whether to retain an independent expert was made by trial counsel and that such an expert was not retained while she was assigned to Petitioner's case. She stated that to her recollection, she never discussed an independent forensic pathologist with trial counsel.

Trial co-counsel testified that a death penalty case was different from other murder cases and that in capital cases, the defense did more than in a "regular case." She said she shared responsibility for the investigation and questioning of witnesses, but as first chair, trial counsel had primary responsibility. She did not recall interviewing witnesses or members of Petitioner's family but recalled that she and counsel visited Petitioner at the jail a few times. She said they received a plea offer from the State, but she could not recall the substance of the offer or when it was received. She accompanied counsel to discuss the offer with Petitioner, but she could not recall when they visited.

Trial co-counsel testified that she did not recall showing the jury a graphic photograph that had been excluded during her closing argument. She agreed that the trial transcript showed that she picked up the excluded photograph but said that the record was unclear whether she showed it to the jury. She did not recall filing pretrial motions but recalled Petitioner's claiming that the shooting was accidental and that he did not know the gun was loaded. She stated that when a client indicted for murder claimed the death was accidental, her practice was to ask for every jury instruction she could get from the trial court, including an instruction on mistake of fact or ignorance. She could not recall if she brought it to the trial court's attention that an instruction for mistake of fact or ignorance was missing from the jury charge.

Trial co-counsel testified that she did not recall that Petitioner suffered from mental disabilities or that as a child, Petitioner was enrolled in special education classes. She said, however, that placement in special education classes was not necessarily an indication of mental disabilities.

Trial co-counsel testified that if she had evidence that witnesses saw Petitioner and the victim embracing a short time before the shooting, she would have presented the evidence to the jury. She said that if she had information that the victim liked Petitioner and was not afraid of him, she would have presented such evidence. She stated that had she known Petitioner turned himself into law enforcement and came back to the scene, she would have presented that evidence to the jury.

Trial co-counsel testified that she did not recall if she knew before the trial that there was an allegation of satanic worship and that she remembered being surprised when devil worship was alleged at the trial. She stated that she was surprised to learn that trial counsel testified that he knew about the devil worship allegation before the trial. She said that although evidence Petitioner attended church would have been favorable, she would have wanted to show his involvement in the church and the community before the shooting.

On cross-examination, trial co-counsel testified she went with trial counsel to the jail near the time of trial to tell Petitioner about the twenty-five-year plea offer. She said that she believed Petitioner should have accepted the offer but that Petitioner was "adamant" about rejecting it. She said that Petitioner changed his mind and wanted to accept the offer but that the State had already revoked it. She recalled that they attempted to negotiate the same offer but that the State only offered life imprisonment.

On redirect examination, trial co-counsel testified that she only became involved with Petitioner's case two months before the trial. When questioned about the State's twenty-five-year plea offer being revoked one year before she was assigned as second chair, she

-14-

conceded that if this were true, she would not have discussed the offer with Petitioner. She maintained, however, that she was present when the twenty-five-year offer was conveyed to Petitioner. On further cross-examination, she said it was possible that she went with trial counsel to discuss a plea with Petitioner before she was assigned to the case. On further redirect examination, trial co-counsel testified that before she became a member of the capital defense team in November 1994, she volunteered for the team for about one year. She said that when an offer was conveyed to a client, the attorney made a note of it in the file.

Christine Glenn testified that she served as the legal investigator for the defense team. She said that counsel told her which witnesses to interview and that she interviewed Tracey Davis on February 21, 1995, the second day of the trial. She said that Ms. Davis failed to respond to her telephone calls and that she was unable to locate Ms. Davis until she arrived to testify at the trial. She interviewed Tyrone Cole on May 11, 1994, and Joyce Hickman, the assistant manager of Pershing Park Apartments. Ms. Hickman had no knowledge of the offense but reported seeing Petitioner's car at the apartment complex the day of the shooting. Ms. Glenn interviewed James Shaw on May 10, 1994, and Jimmy Thomas, the boyfriend of the victim's mother, on May 11, 1994. She said these were the only witnesses she interviewed in preparation for the guilt phase of Petitioner's trial. She said that when she attempted unsuccessfully to contact a witness, she made a log entry of her attempts. She agreed that her file did not contain such a log.

Ms. Glenn testified that her file did not show that she interviewed Harry Ward, Cynthia Nesbit, Joan Jahi, Alfred Campbell, Oscar Jones, Ophelia Jones, Dorothy Ward, Thelma Cowans, Bernice Stephenson, Louise Cowans, Rene Cowans, Renee Williams, Ketoe Brown, Fred Nesbit, Sr., Terita Tate, Constance Branch, Ernestine Branch, Quinton Curry, Bernice Nesbit, Patrick Nesbit, Lula Harris, or Fred Nesbit, Jr. She stated that interviews of family members were generally conducted by the social worker rather than the legal investigator. She did not attempt to interview the police officers.

On cross-examination, Ms. Glenn testified that she visited Petitioner at the jail on multiple occasions. She said her file did not show that Petitioner identified additional witnesses for her to interview. She said that if Petitioner gave her additional names, she would have spoken with them. She said none of the witnesses she interviewed provided her with names of potential witnesses.

On redirect examination, Ms. Glenn testified that her file did not show that she attempted to speak with uncooperative witnesses. She said her file did not show they canvassed Pershing Apartments to identify potential witnesses. She stated that unless a

witness was listed on the indictment or discovered through her interviews of witnesses listed on the indictment, she would not have conducted an interview.

Elizabeth Benson, a mitigation specialist with the Shelby County Public Defender's Office, testified that Petitioner told her to speak with his parents; Bernice Stephenson, his grandmother; Larry Barnett, his uncle; and James Shaw, a man considered to be his uncle. Although Ms. Benson contacted Ms. Stephenson about Petitioner's hospital stay in Nashville, her file did not show that she interviewed Ms. Stephenson about Petitioner's social history. She said her records did not show she interviewed Petitioner's mother, Oscar Jones, Lashandra Nesbit, Oscar Jones, Jr., Bernice Stephenson, James Shaw, or Larry Barnett. She said that the second page of the Public Defender's Office's intake form had her handwritten notes which showed Petitioner's parents, Jessica, Petitioner's girlfriend, and Petitioner's aunts and uncles visited Petitioner at the jail every day since his arrest.

Ms. Benson testified that Petitioner's educational records showed that Petitioner left school in the ninth grade to care for his grandmother, Bernice Stephenson. She said that based on her interview of Petitioner, she determined Petitioner could not read well but could read well enough to understand. She said she requested records from the school board but did not request records from the special education section.

Ms. Benson testified that hospital records showed that on April 4, 1993, Petitioner was admitted for a possible seizure. She agreed the shooting occurred on May 21, 1993. She said that she noted in her file that Petitioner attended church at Christ Baptist but that nothing in the file showed she interviewed anyone at the church. She also stated that nothing in the file showed she interviewed Dale Stephenson, Petitioner's stepgrandfather, Yolanda Jackson, Cynthia Nesbit, Fred Nesbit, Harry Ward, Joan Jahi, Alfred Campbell, Ophelia Jones, Dorothy Ward, Velma Cowans, Louise Cowans, Renee Cowans, Oscar Jones, Jr., Renia Williams, Ketoe Brown, Terita Tate, Constance Branch, Ernestine Branch, Quinton Curry, Tracey Davis, Tyrone Cole, Fred Nesbit, Jr., or Patrick Nesbit. She could not recall conducting interviews in Petitioner's case because the trial was approximately ten years ago. She stated that gathering information was based on whom Petitioner and his family identified but that her file did not show she spoke with Petitioner's family.

On cross-examination, Ms. Benson testified that she and original counsel interviewed Petitioner at the jail on September 2, 1993, and that Petitioner gave her the telephone number of Jessica Mill, Petitioner's pregnant girlfriend. She could not remember if she attempted to contact Ms. Mill. She did not accompany the attorneys to meet with family members and witnesses and did not know whom trial counsel interviewed. On redirect examination, Ms. Benson stated that as an investigator with the District Public Defender's Office, she had access to courthouse computers, "Cole's Books," which helped locate people, and jail

records. She said her file did not show that she used any of these resources to locate any of the known witnesses.

Glori Shettles, a mitigation investigation expert, testified that in April 1993, Petitioner was taken to the emergency room due to a seizure and that although Petitioner was alert at the hospital, he was unaware of what occurred. Records showed that no known cause for the incident was found and that Petitioner did not have drugs or alcohol in his system. She stated that she located Petitioner's school records and that the records showed he was enrolled in resource or special education classes. She stated that Petitioner gave her approximately fifty names of family members, friends, teachers, and classmates for her to contact. Although she had difficulty locating some of the people, such as women who married and changed their names, she made contact with many of them.

Rachael Geiser, an expert in the field of guilt phase investigation, testified that after reviewing the Public Defender's file, the first thing she would have done was interview James Shaw, Tyrone Cole, Tracey Davis, Constance Cannon, Cynthia Nesbit, and Jimmy Thomas and attempt to interview the victim's children. She said that the victim's civil and criminal background should have been investigated. Such an investigation would have included interviewing the victim's former and current boyfriends and obtaining the victim's mental health and medical records. She said she would have canvassed Pershing Park Apartments for additional witnesses that were not named in the indictment or discovery materials. She said the canvas could have led to other witnesses that heard or saw something the night before or the day of the shooting. She said information should have been developed about Petitioner and the victim's relationship before and the day of the shooting. She said she would have wanted to know if someone saw Petitioner and victim together the day of the shooting and general information about their relationship. She said she would have met with the medical examiner, reviewed all the physical evidence, and considered the necessary experts. She "thought . . . a ballistics expert or pathologist would have been used" in Petitioner's defense. She said she would have photographed the scene.

Ms. Geiser testified that not all of the standard tasks she would have performed in Petitioner's case were done by counsel or the defense team. She said her review of counsel's file showed that Tracey Davis was interviewed for the first time at the trial on February 21, 1995. She said the defense team conducted in-person interviews of James Shaw and Joyce Hickman, the Pershing Park Apartments manager, and telephone interviews of Jimmy Thomas and Tyrone Cole. The defense team attempted to interview Tyrone Johnson. To her knowledge, nothing else was done in preparation for Petitioner's trial.

Ms. Geiser testified that after reviewing the defense team's notes from their interviews of Ms. Davis, Mr. Shaw, Mr. Hickman, Mr. Thomas, and Mr. Cole, she concluded that the

interviews produced information that required followup. She said that Ms. Davis said "several neighbors" saw the victim and Petitioner "all hugged up together" the day of the shooting but that no one from the defense team asked Ms. Davis the names of the neighbors who saw the victim and Petitioner together.

Ms. Geiser testified that her own investigation resulted in additional information and witnesses that would have benefitted Petitioner's defense. She said she found information about Petitioner and the victim's relationship before and the day of the shooting and the victim's background. She said she interviewed Quinton Curry after finding him at home. She stated that although she sometimes only had the first name of a potential witness, she could still find the person. She said that when she only had a first name, finding that person required going to the person's neighborhood and asking people for information. She said this was "the most successful" way to locate someone whose first name was the only known information.

Ms. Geiser testified that Quinton Curry told her that he saw the victim and Petitioner at approximately 11:00 a.m. on the day of the shooting while he and his nephew, Kareem Curry, walked to the local basketball court. Mr. Curry said that the victim and Petitioner were embracing and that the victim did not appear to be frightened of Petitioner. He told Ms. Geiser that Petitioner had a gun that morning and allowed him to shoot the gun once into the air. She said Mr. Curry lived in Memphis with his aunt at the time of the shooting. She stated that she located Kareem Curry in a Wisconsin prison and that he gave her similar information. She said Kareem was living at Pershing Park Apartments at the time of the shooting and remained in Memphis for "a period of years." She thought that had the defense team canvassed Pershing Park Apartments, Quinton Curry probably would have been interviewed immediately.

Ms. Geiser testified that she interviewed Constance Cannon, the victim's sister, and that she did not have difficulty locating Ms. Cannon. Ms. Cannon told her that the victim did not mention being afraid of Petitioner. She said that she interviewed Tracy Davis, who stated that the victim and Petitioner only dated for a short time, that the victim told Ms. Davis that she liked Petitioner, and that the victim never expressed fear of Petitioner. Ms. Davis told Ms. Geiser the victim liked to wear Aigner "mule-like" shoes that were too small and caused calluses on her feet. Ms. Davis told her that the victim "could walk on glass with those feet" and that the victim burned her neck with a curling iron and showed the burns to Ms. Davis.

Ms. Geiser testified that she interviewed Jerrel Chambers, who fathered three of the victim's five children. Mr. Chambers told Ms. Geiser that the victim was dating someone other than Petitioner at the time of the shooting. Ms. Davis told Ms. Geiser that the victim was dating a man named Jimmy who was harassing her at the time of her death. Ms. Geiser

also interviewed Lula Harris, who told her that the victim was dating Jimmy at the time of her death.

Ms. Geiser testified that she interviewed James Shaw and Cynthia Nesbit. They said they saw burns on the victim's neck before the victim met Petitioner. Mr. Shaw told Ms. Geiser that although Mr. Shaw was interviewed by Petitioner's defense team, he was not asked about the victim's burns. Ms. Geiser said she would have found these additional witness before Petitioner's trial in 1995.

Ms. Geiser testified that she obtained the victim's medical records from Regional Medical Center because she wanted to learn about the victim's lifestyle and with whom the victim may have had contact around the time of the shooting. She said the victim's medical records showed that she smoked cigarettes throughout her pregnancy and tested positive for cocaine, barbiturates, benzodiazepines, marijuana, and opiate metabolites while pregnant. Ms. Geiser said that she interviewed Dr. Smith, who said he had information that one of the victim's children said that Petitioner burned the victim.

Ms. Geiser testified that the management company for Pershing Park Apartments was still in Memphis and that they destroyed tenant records every five years. She said tenant records from 1993 had been destroyed by the time she began her investigation. She stated that because the records were destroyed, it was more difficult to locate people who lived at Pershing Park Apartments in 1993. She said the only method of gathering names of new witnesses was to ask known witnesses. She said canvassing Pershing Park Apartments at the time of the shooting was important given the torture allegation raised at the trial. She said tenants may have heard or seen something relevant to Petitioner's case. There was no evidence in counsel's file that a list of tenant names was obtained. The management company's attorney said he would have provided such a list had someone asked for the information. Ms. Geiser said the attorney had the tenant information until 1998.

Ms. Geiser testified that with the information she found, the defense team could have presented a better case for negligence, recklessness, or an accidental shooting. She said that the investigation conducted by Petitioner's defense team was not acceptable under any standard in the profession of investigation and that the investigation did not meet "the absolute bare minimum requirements" of criminal investigation in Memphis, in Tennessee, or in the United States. She said that had she done only what was done in Petitioner's case before the trial, her employment would have been terminated. She said that the areas of mitigation and legal investigation were not mutually exclusive and that a capital defense team must work together. She said her work as an investigator for the guilt phase did not mean that she did not speak with mitigation witnesses simply because Ms. Shettles was responsible

-19-

for mitigation. She said that in many situations, as in Petitioner's case, many witnesses had factual and mitigating information.

On cross-examination, Ms. Geiser testified that she did not listen to the audio tapes of interviews from the counsel's file because she did not have the audio tapes. She said she requested the tapes but did not receive them. She said she did not interview Petitioner's original counsel, trial counsel, or the original investigators before rendering her opinion. On redirect examination, Ms. Geiser testified that she did not speak with counsel because she had the file, which included everything counsel documented. She said post-conviction counsel interviewed original and trial counsel.

Toya Rice, a clerical specialist at the Shelby County Sheriff's Department, presented Petitioner's jail visitation records from 1993 to 1995. She said the jail visitation records showed that original counsel, original co-counsel, Ms. Benson, Ms. Glenn, and trial co-counsel never visited Petitioner. The records showed that trial counsel visited Petitioner on four occasions, on February 2, February 9, February 21, and September 16, 1995. The records did not show the duration of each visit.

On cross-examination, Ms. Rice testified that the jail clerk on duty at the time of each visit was responsible for making the visitation record and that if the clerk failed to do so, there would be no record of the visit. On redirect examination, Ms. Rice testified that people other than Petitioner's defense team visited Petitioner at the jail many times. She stated that had original counsel, original co-counsel, trial co-counsel, Ms. Benson, or Ms. Glenn visited Petitioner numerous times at the jail, there would be a record of each visit.

Annette Jones, Petitioner's mother, testified that she met Petitioner's attorneys at the courthouse and that she attempted to call trial counsel several times. She said that because she had difficulty reaching trial counsel by telephone, she went to the Public Defender's Office. She said that Ms. Benson contacted her about the twenty-five-year plea offer and that Ms. Benson asked her to help convince Petitioner to accept the offer. She stated that she told Petitioner to accept the offer and that Petitioner wanted to accept it after speaking with her. She agreed that Petitioner tried to contact counsel about his decision to accept the plea offer. She said that she went to counsel's office within two days of speaking with Petitioner and told counsel Petitioner wanted to accept the offer and that he said, "[H]e would take care of it." Although Ms. Jones could not remember the date Petitioner decided to accept the offer, she recalled, "It was during the time of that ice storm."

Ms. Jones testified that she did not learn the case was going to trial until she came to court and saw a jury being selected. She was not subpoenaed or given written notice of the trial date. She said trial counsel did not speak with her until the last day of the trial. She

agreed trial counsel said that the "situation [was] critical" and that they needed someone to testify on Petitioner's behalf. She said counsel asked her not to show any emotion when she testified at the sentencing phase of the trial and spent approximately five to ten minutes speaking with her before she testified.

On cross-examination, Ms. Jones testified that when she first discussed the plea offer with Petitioner, he did not want to accept the offer and claimed he was innocent but that he later wanted to accept it. Ms. Jones said that Petitioner did not know his case was going to trial and that he believed his court appearance was to enter a plea. On redirect examination, Ms. Jones testified that she had no experience with the criminal justice system before Petitioner's arrest. She had no knowledge about capital murder trials and Petitioner's attorneys did not explain the procedure.

Quinton Curry testified that in 1993 he lived at Pershing Park Apartments, that he knew the victim, and that the victim lived in the "next building over" from his apartment. He said that on the morning of the shooting, he and his nephew, Kareem Curry, were outside playing basketball at Pershing Park Apartments. Quinton Curry first stated he did not see Petitioner the morning of the shooting, but then said he saw the victim and Petitioner standing together in the doorway of the victim's apartment. He said that he saw the victim laughing and smiling and that the victim and Petitioner were hugging that morning.

Mr. Curry testified that Petitioner showed him a gun and allowed him to shoot it into the air. He said that the victim stood in the doorway of her apartment when he fired the gun and that the victim did not appear to be frightened. He gave the gun back to Petitioner, and Petitioner and the victim returned to the victim's apartment. He said he heard another gunshot a short time later. He said he did not see anyone leave the apartment following the gunshot. He stated that he left the apartment complex and that when he returned, the police had arrived. He said that he lived at the complex for five years and that he was not interviewed. He said he would have told investigators what he saw had they asked. He said his nephew, Kareem Curry, stayed in Memphis for a few years after the shooting.

On cross-examination, Mr. Curry testified that he did not call the police about seeing the victim and Petitioner the day of the shooting because it was none of his business. He said he saw the victim and Petitioner at approximately 8:00 to 9:00 a.m. He said that the gun was a .357 and that he had never seen it before that day. He said that after he fired the gun, Petitioner took the gun back into the victim's apartment. After he testified, a bench conference was held in which the trial court asked about Mr. Curry's mental capabilities. Post-conviction counsel told the court Mr. Curry was intellectually disabled but had been consistent in stating what he saw the day of the shooting.

Kareem Curry testified that he knew Petitioner as "Red" and that he dated Petitioner's sister for approximately one or two years beginning around 1990 or 1991. He said he met Petitioner when he and Petitioner's family both lived at Alta Vista Apartments in Memphis. At the time of the victim's death, he was fifteen years old and lived at Pershing Park Apartments with his grandmother. He described the Nesbit family as "[G]od fearing people" and said they were Baptists. He never went to church with the Nesbit family but understood they spent a lot of time there. He said Petitioner went to church with his family. He neither heard that Petitioner was involved in satanic worship nor saw signs that Petitioner was involved in satanic worship. He said Petitioner was a normal person, outspoken, and talked a lot. He said he never saw Petitioner angry or act violent toward other people. He said he and Petitioner were not friends, as Petitioner was much older. He said that Petitioner was respectful toward women and that he never saw Petitioner fight with a woman.

Kareem testified that his apartment was about fifty to sixty feet from the victim's apartment. He said that on the day of the shooting around 11:00 a.m. to noon, he and Quinton Curry, his uncle, saw Petitioner and the victim standing outside the doorway of an apartment. His uncle, Quinton Curry, approached the victim and Petitioner and spoke to them while Kareem stood twenty to thirty feet away. He said that although he was unable to hear the conversation, they appeared friendly. He said the victim and Petitioner were standing close together and his uncle stood in front of them. Although he said he did not know Petitioner and the victim had a romantic relationship, he said their body language and their standing close together gave him the impression they were "boyfriend and girlfriend or something like that."

Kareem testified that although the shooting occurred about ten years before his testimony, he remembered the shooting. He said the defense team did not speak with him about seeing the victim and Petitioner the day of the shooting. He said the first person who spoke to him about the day of the shooting was the post-conviction investigator in 2002. He said that had someone talked to him in 1993 or 1994, he would have told them what he saw the day of the shooting and testified at the trial. He said that after the victim died, he remained at Pershing Park Apartments for one to two years before going to Wisconsin.

Bernice W. Nesbit testified that although she had the same last name as Petitioner, they were not related. She said that she lived at Pershing Park Apartments and that although she did not know the victim, she could see the victim's apartment from her apartment and saw the victim around the apartments. She said the front door of each apartment led into the living room and the backdoor led into the kitchen. She said a yard-like area was at the backdoor of the apartment with a sidewalk. She said she heard a loud noise the day of the shooting but did not remember the direction from which it came. She said that gunshots were

not uncommon in the area and that she heard them periodically. On cross-examination, she testified that she thought she heard the loud noise before 12:00 p.m.

Cynthia Nesbit, Petitioner's aunt, testified that she lived with James Shaw at Pershing Park Apartments at the time of the victim's death and knew the victim. She said Petitioner met the victim when he came to visit her. The victim saw Petitioner while he visited Ms. Nesbit, and after Petitioner left, the victim asked Ms. Nesbit about Petitioner. Ms. Nesbit told the victim that Petitioner was her nephew. The next time Petitioner came to visit Ms. Nesbit, the victim saw Petitioner and came to Ms. Nesbit's apartment to meet him.

Ms. Nesbit testified that she was home the day of the shooting but that she only saw Petitioner shortly before he was arrested. She said she saw Petitioner in the parking lot of the apartment complex following the victim's death. Petitioner told her and Mr. Shaw that "something had happened" and that it was an accident. She described Petitioner as upset, nervous, and afraid. She said that after they spoke, a police officer yelled at Petitioner, asking if he was "Red." When Petitioner admitted that he was "Red," the officers took him into custody. She said that although she attended Petitioner's trial, she was not contacted or interviewed by the defense team.

Ms. Nesbit testified that she learned of the plea offer from her sister, Joan Campbell, who learned of the offer from Petitioner. She said that none of Petitioner's attorneys spoke to her about Petitioner's case. She said that although she did not attempt to speak with Petitioner's attorneys, Petitioner's mother, Annette Jones, tried to speak with them. She went with Ms. Jones to the Public Defender's Office when Ms. Jones tried to speak with the attorneys about the offer. She said Petitioner wanted to accept the twenty-five-year offer.

Ms. Nesbit testified that she saw the victim smoke marijuana on the back steps of the apartment complex "on several occasions." She remembered a pair of shoes that the victim wore "all the time" and described the shoes as "open . . . with . . . a strap across the instep with a little small heel." She said that the victim had slim, long feet and that the back of her heels hung over the shoes as she walked. She said that before the victim met Petitioner, she saw the victim with burn marks on the back of her neck and forehead from a curling iron. She remembered that she and the victim spoke about the burns while sitting on the front porch one day. She said that she and the victim discussed how they curled their hair with a curling iron and recalled that they both started curling their hair in the front. She also recalled that they both agreed that by the time they reached the hair in the back, their arms were tired, which caused the curling iron to "slip down" their necks.

Ms. Nesbit testified that Petitioner was a nice person and that she did not know Petitioner to be involved in drugs and gangs or be violent toward women. She said

Petitioner's mother took Petitioner to church and that the Nesbit family was "a churchgoing family."

On cross-examination, Ms. Nesbit testified that she did not tell counsel that she knew anything about Petitioner's case. She denied hearing Petitioner tell Mr. Shaw that the victim killed herself while playing Russian roulette, and she explained that at that time, her attention was focused on the police officers in the area who called out "Red's" name. She denied hearing that Petitioner worshiped the devil and had to kill two people to gain more power.

On redirect examination, Ms. Nesbit testified that the allegation about devil worship came from the prosecutor before and at the trial. She said the prosecutor told Mr. Shaw Petitioner was involved in devil worship. She said that Mr. Shaw first heard Petitioner was involved in devil worship from the victim's family. She said the victim's family "put out" that Petitioner worshiped the devil. She said the prosecutor told Mr. Shaw that Petitioner "had to kill two people to gain some kind of power" just before calling him as a witness at the trial. She said that Petitioner was a Christian and that he attended church.

On recross-examination, Ms. Nesbit testified that Mr. Shaw got his information about devil worship from her because she told Mr. Shaw that the assistant manager told her that the victim's family told people that Petitioner practiced devil worship. She said the next time Mr. Shaw heard about devil worshiping was from the prosecutor before Mr. Shaw testified at the trial. She was not aware that counsel knew about the devil worship allegation.

On further redirect examination, Ms. Nesbit testified that she spoke with Mr. Shaw after his conversation with the prosecutor and that Mr. Shaw said the prosecutor told him devil worshiping meant killing people to gain power. She said neither Mr. Shaw nor any of the Nesbit family heard about killing two people for power. On further recross-examination, she testified that after she heard Mr. Shaw's testimony at the trial, she did not say anything to counsel to clarify Mr. Shaw's testimony. She said she did not know why she did not speak with the attorneys directly at the trial. On further redirect examination, she testified that Petitioner's trial was the first she attended and that she was not free to speak with the attorneys whenever she wanted. She said that the attorneys were difficult to contact and that they were "never in their offices." She said that although counsel did not speak to her, her sister gave the defense team the information about the devil worship and how Mr. Shaw learned of the allegation. On further recross-examination, she testified that she remembered going to the Public Defender's Office when her sister went to explain how Mr. Shaw knew of the allegation. She agreed she did not hear the discussion between her sister and counsel.

James Shaw testified that on the day of the shooting, he heard two gunshots, one in the morning and one in the afternoon. Mr. Shaw said that after he heard the first gunshot,

he opened his apartment door, looked outside, and saw Quinton Curry handing the gun to Petitioner. After Quinton handed the gun to Petitioner, Quinton walked up the sidewalk and Petitioner went into the victim's apartment. He said he heard a second gunshot while sitting on his balcony. He said that after he heard the second gunshot, he saw Petitioner get into his car and leave Pershing Park Apartments. He said Petitioner "walked across the lawn as usual and to his car. He . . . [had] an expression like he had messed up. . . ." He said Petitioner "just dropped his head . . . and looked off . . . like he had [done] something wrong."

Mr. Shaw testified that Petitioner's defense team did not speak with him before the trial. He said the prosecutor spoke with him and brought to his attention an allegation that Petitioner was involved in devil worship. He said the prosecutor spoke with him a couple of months before the trial and again the day he testified at the trial about the devil worship. He did not recall Cynthia Nesbit's speaking to him about devil worship. He said that the day he testified at the trial, the prosecutor asked him about Petitioner's possible involvement in devil worship. He told the prosecutor that Petitioner never said anything to him about devil worship. He said he had known Petitioner for approximately ten years at the time of the trial and knew Petitioner well. He said that he trusted Petitioner, that Petitioner was a nice young man, and that Petitioner was always respectful. He said that Petitioner worked for him for a short time and that he never heard Petitioner was involved in devil worship until he met with the prosecutor.

Mr. Shaw testified that he saw burn marks on the victim's skin "several times" before the day of the shooting. He said that sometimes he saw the victim curling her hair and that she sometimes burned herself around her neck. He said he also noticed the victim "walked on the back" of her shoes, which he called "slides." He did not see the victim the day of the shooting.

Mr. Shaw testified that Petitioner returned to Pershing Park Apartments. Mr. Shaw and Cynthia Nesbit spoke to Petitioner, who said he accidentally shot the victim but did not state how the shooting occurred. Mr. Shaw told Petitioner that if the shooting was an accident, he should not run. He said Petitioner thought the gun was unloaded. Petitioner told him where he placed the gun, and as he and Petitioner were leaving to obtain the gun for the police, a female police officer stopped them. He said that Petitioner admitted to the officer that he was "Red" and that Petitioner was arrested.

On cross-examination, Mr. Shaw testified that he did not recall Petitioner's telling him that the victim shot herself while playing Russian roulette or Cynthia Nesbit's telling him about rumors that Petitioner was involved in satanism. He stated that he had a stroke after

-25-

the trial and that although he did not recall his trial testimony, he told the truth. He said he did not know anything about Petitioner's being involved in devil worship.

On redirect examination, Mr. Shaw testified that the prosecutor said there was a mark on the victim's neck and that Petitioner "had to kill one person to gain his power." He did not know the source of the devil worship allegation.

Koete Brown testified that he had known Petitioner since the fourth grade. He said he was at the victim's apartment with Petitioner the day before the shooting. He said he and Petitioner stayed at the victim's apartment for fifteen to twenty minutes. He said the victim did not act afraid of Petitioner. He said the victim and Petitioner both acted normal that morning. He said he never knew Petitioner to carry a gun or to cause trouble. He knew that Petitioner was dating three women, including the victim, at the time of the shooting. He never knew Petitioner to be violent and never saw Petitioner be violent with the victim. He stated that he was not contacted by Petitioner's defense team and that he would have cooperated with them had they made contact. On cross-examination, Mr. Brown testified that he was incarcerated for attempted murder.

Fred Nesbit, Jr., Petitioner's uncle and younger brother of Ashley Nesbit, testified that he had known Petitioner for most of Petitioner's life. He said that the day before Petitioner was arrested, he saw his brother Ashley at the Royal Oaks Motel. He said Ashley lived at the motel and sold drug paraphernalia from his room. He said that Ashley had been in trouble throughout his life but that Petitioner had not.

Mr. Nesbit testified that he saw Petitioner the day before the shooting at the motel after Petitioner returned from a convenience store. When he arrived at Ashley's motel room, he saw that Ashley was "completely high. Eyes half shut. Dark Red." He said that this was usual behavior for Ashley, that Ashley had a gun in his motel room, and that he went to see Ashley because he was told Ashley was robbed. He said that when he arrived, he saw a loaded .38 caliber pistol. He said Petitioner arrived a short time later. He said he spoke to Ashley about giving him the gun. He worried that Ashley might "do something foolish" because Ashley was under the influence of drugs. Although he tried to convince Ashley to give him the gun, he refused. He said Petitioner was in the motel room at the time he tried to get the gun away from Ashley. He said that he did not want to argue about a loaded gun, that he asked Petitioner to take care of Ashley, and that he left the motel. He learned the next day of Petitioner's arrest.

Mr. Nesbit testified that he never knew Petitioner to carry or own a gun and that Petitioner was not familiar with guns. He stated that he did not know if Petitioner took the gun from Ashley before leaving the motel but that if Petitioner took the gun, Petitioner did

-26-

so after Ashley fell asleep. He said the only place Petitioner could have obtained a gun was from Ashley. He never knew Petitioner to be violent or abuse women. He said he was never contacted by Petitioner's defense team but said he would have spoken to them had they contacted him.

Tracy Davis testified that she and the victim were "very close friends" and that they lived in adjacent apartments. She also lived next door to Cynthia Nesbit and James Shaw. She said that as she was going back and forth from her apartment and the complex's laundry room, she heard children crying for over one hour and decided to check on the victim's children. She said that on her last trip from the laundry room to her apartment, she saw the victim's children walking up the steps to Ms. Davis's back door. She said that she decided to check on the victim, that she entered the victim's apartment, and that she found the victim dead.

Ms. Davis testified that she heard two gunshots the day of the shooting, one in the morning and one in the afternoon. She said that she saw the victim and Petitioner together earlier in the day and that they were "hugged up." She stated that Petitioner and the victim were embracing and that they looked as though they were getting along. The victim told her that she was dating Petitioner and that she liked Petitioner. The victim never told Ms. Davis that she was afraid of Petitioner. She saw the victim and Petitioner together approximately five times but only saw them embracing once.

Ms. Davis testified that the victim smoked cigarettes and that she had seen a burn on the victim's ear from a curling iron. She said the victim was also dating someone named James, who went by the name Jimmy. She said the victim met Jimmy before meeting Petitioner. She said she continued to live at Pershing Park Apartments for approximately one month after the victim died. She said that although counsel spoke to her at the courthouse the day of her testimony, counsel did not ask about her seeing the victim and Petitioner together or the victim's relationship with Petitioner. On cross-examination, Ms. Davis stated that she saw a burn on the victim's ear in 1992 when she and the victim lived at Robinhood Apartments.

Patrick Nesbit, Petitioner's uncle, testified that he saw Petitioner at Little Caesar's Pizza the day of the shooting. He said Petitioner appeared "lost" and "confused," which was abnormal. Petitioner told him that "a young lady hurt herself" but Petitioner did not say that he shot the victim. He stated that he drove Petitioner back to Pershing Park Apartments. He said Petitioner did not attempt to run and went to the apartment complex willingly. He described Petitioner as "a good person," hard worker, and helpful to others. He never knew Petitioner to be violent, carry a gun, or sell drugs. He said Petitioner's defense team did not

interview him. On cross-examination, he testified that Petitioner did not explain the details of the shooting or tell him that he shot the victim.

Dr. Richard Page Hudson, an expert in the field of forensic pathology, testified that he reviewed Petitioner's case, including forty-one photographs, the Tennessee Supreme Court's opinion in Petitioner's case, Dr. O.C. Smith's trial testimony about the victim's injuries, crime scene diagrams, the autopsy report, glass microscopic slides from the autopsy, the trial testimony of Officers Sampson, Cook, and Williams, and Petitioner's trial testimony. He said this provided him with sufficient information to evaluate and give an opinion about the victim's death and injuries. Dr. Hudson said he agreed with some of Dr. Smith's conclusions but took exceptions to others.

Dr. Hudson testified that all the burns on the victim were consistent with "touch burns" or light burns that resulted from a hot object touching the skin for a short period of time. He was unable to determine the specific cause of the burn on the back of the victim's neck but said the burns on the back of the victim's neck, arm, and stomach were consistent with a burn from a curling iron. He said that the burn on the victim's chin had sooting on the superficial skin around the burn but that he did not think the burn was caused by an open flame. He said that as a medical examiner, he not only examined bodies, but also used outside information such as witness interviews in reaching his conclusions. He said consuming alcohol or smoking marijuana while using a curling iron might have an impact on coordination and lead to burning the skin.

Dr. Hudson testified that because the victim's burns showed little tissue reaction, the burns could have been inflicted up to twenty-four hours before the victim's death. He said that when an injury occurs, the body responds with various kinds of chemical and anatomical changes and that a pathologist was primarily concerned with anatomic changes that could be seen with a microscope. He explained the anatomical changes he considered were the lesions having characteristics of the burn itself, which was almost an instant reaction to a heat source. Another change he considered was the "infiltrate of white blood cells," or polymorphonuclear leukocytes (PMNs). He said that PMNs took hours to appear depending on the type of injury and whether the injury was clean or a foreign substance was introduced into the body. He said PMNs took "a good many hours" to appear in a clean burn. He clarified that a clean burn was not contaminated by bacteria or the external environment. He stated that PMNs were present in one of the victim's burns but that he found no "appreciable arrival" of PMNs in the other burns. He believed that the victim's "touch burns" would have caused mild to moderate pain.

Dr. Hudson testified that the burns on the victim's body were random because they were in a "variety of places" but appeared to center around the neck and side of the head.

He said the neck and side of the head were the areas in which a curling iron would be used. He thought that reckless use of a curling iron could have caused the burns on the victim's arm and stomach.

Dr. Hudson testified that Petitioner held the gun between his chin and neck when the gun fired. He recalled Petitioner said he held the gun in that position. He agreed with Dr. Smith's conclusion that the gun was fired one to three feet from the victim. He said that the gunshot wound was consistent with Petitioner standing as he testified at the trial, that Petitioner held the gun around his chest area, and that Petitioner recklessly pulled the trigger.

Dr. Hudson testified that he reviewed photographs and slides of tissue samples of the victim's feet. He said that the photograph of the victim's left foot showed no abnormalities and that the tissue slides of the left foot showed no hemorrhaging or inflammation. He said that he could not diagnose any bruising on the victim's left foot and that he did not conclude the victim's left foot was beaten. He said that when he looked for evidence of bruising or hemorrhaging, he looked for discoloration that would be "reddish purple or purple bruising." He said older bruises could also present as yellow or green. He said the photograph of the victim's left foot showed no signs of new or old bruising or hemorrhaging.

Dr. Hudson testified that he found "slightly reddened darkening" discoloration on the victim's right foot and that the discolored areas were about one-quarter of an inch wide. He also found "darkening in a broadband" pattern in the arch of the foot that had a "faint yellow green tinge to it." He stated that in trauma and injury contexts, the yellow and green coloration was evidence of a healing bruise. He said that the yellow and green coloration took "a couple of days at least" to appear depending on the thickness of the bruise and other elements. Upon questioning by the trial court, Dr. Hudson testified that if the marking on the victim's right foot was in fact a bruise, it was "a couple of days or more in age." He said that the tissue slides of the victim's right foot showed no signs of bruising. He did not see a bruise microscopically. He said the discoloration could have been caused by wearing shoes or an "irregularity in the inner surface of the shoes," a pair of clogs, or slides, that were too small causing the feet to hang over the back of the shoe. He said that the bottom of a foot was capable of bruising and that he expected to see bruising if the bottom of the foot was repeatedly and forcefully struck. He said he expected to see such bruising in a photograph depending on the photograph's quality. He stated that he did not know what caused the markings on the victim's right foot but said that if there was an allegation that the victim was beaten, he would have asked the police if they found something in the victim's general area that could have been used to inflict injury. He said he would have looked for things that were out of place or some type of abnormal condition at the scene and looked at witness statements.

Dr. Hudson testified that his ultimate conclusion was that he could not state with a reasonable degree of medical certainty that the victim was tortured. He said it was possible that the victim was not tortured. He said that a person could be tortured without leaving markings on the body but that based on his experience and the thousands of autopsies he had performed, the idea that this killing involved a satanic ritual never occurred to him.

Dr. Hudson testified that he was familiar with the term "falanga" and recalled that Dr. Smith testified at the trial that falanga was a sophisticated form of torture used in Turkey. He said that in his opinion, it would be "highly unlikely" that this sophisticated form of torture was used by a nineteen-year-old man from Memphis's inner city with limited education, a low IQ, and no history of violence. He said that he had never seen falanga in the Southeastern United States in his eighteen-year tenure at the North Carolina Medical Examiner's Office. He said that based on his review of Petitioner's case, the evidence could be consistent with the version of events to which Petitioner testified at the trial.

On cross-examination, Dr. Hudson testified that the photographs he examined were not the best quality and agreed that he did not have the opportunity to examine the body at the time of the shooting. He said that although Dr. Smith found soot in the burn under the victim's chin, Dr. Hudson did not see soot in the photograph he reviewed. He said soot deposits indicated an open flame burn or two other possibilities. First, the soot could have been caused by a hot object that had something on it that smoldered without turning into an open flame. Second, the soot could have been caused by a superficial charring where heat was applied to the skin and the skin charred. He said, though, that he expected more tissue damage if that much heat were applied to the skin. He agreed Dr. Smith did not describe similar skin damage. He agreed that blowing out a lit match caused smoke and carbon to form on the outside of the match. He said it was also possible that a heated curling iron with "salve" on it caused smoke and the same type of carbon to form.

Dr. Hudson testified that the autopsy report showed the victim's blood was negative for drugs and alcohol and agreed that it was not likely that the victim was intoxicated while trying to curl her hair in the "few hours immediately before death." Although the evidence was consistent with Petitioner's version of the events, he agreed that the evidence was also consistent with Petitioner's standing one to three feet from the victim, holding the gun out, and shooting the victim.

Dr. Hudson testified that all of the burns, except the burn under the chin, were consistent with a curling iron burn. He said all the burns were inflicted up to twenty-four hours before the victim's death, with the exception of the burn that appeared to be older. He agreed that if he were given information that one of the victim's children said that Petitioner burned his mother, he would place the burns closer to the victim's death.

-30-

Dr. Hudson testified that although he had never performed an autopsy where the manner of death was through a satanic ritual, the issue of satanism occasionally arose. He said that if Petitioner held the gun close to his chest, Petitioner would have possibly gotten gunpowder burns on his chest. He said, though, it would depend on the quality and model of the weapon.

Dr. Hudson testified that it was possible the photographs were poor reproductions and that it was possible that the victim's feet had dirt on them as noted in Dr. Smith's autopsy report. He said his opinion was not that Dr. Smith's conclusion of falanga was wrong. He said, "What I see described and documented in at least one of the photographs on the bottom of the foot is consistent with it." He said that the skin on the feet was "fairly tough" and that it was possible to be struck on the foot without leaving a mark.

On redirect examination, Dr. Hudson testified that although one of the markings on the feet was consistent with falanga, the same marking was also consistent with something else. He said given "the total picture," he considered falanga "highly unlikely." He said that the information he obtained from the medical examiner's office did not show that one of the victim's children stated that Petitioner burned his mother. The additional information that Petitioner and the victim were seen embracing and laughing shortly before the victim was shot would be important in reaching his conclusion. He said witness statements that Petitioner and the victim were seen laughing and embracing was inconsistent with the victim's being tortured for two hours and then being shot.

Dr. Hudson testified that there was no evidence that the victim was restrained and that he would have looked for restraint marks if torture was suspected and noted any marks in the autopsy report. He agreed Dr. Smith made no notes in the autopsy report regarding restraint marks. He said that Dr. Smith failed to label the tissue slides in such a way that the samples could be matched with the particular wound on the body. He said Dr. Smith's failure made it impossible to determine which slide corresponded to a particular wound. He said that generally, labeling was not necessary but that when a body had multiple burns and there was an issue about when the burns were inflicted, it was important to label the burns to establish time frames for each burn.

Dr. Hudson testified that he thought the burn under the victim's chin could have been explained by the igniting of hair lotion or cream that was on a hot curling iron. He said the materials he reviewed showed that an unlit match was found near the body at the crime scene but that an unlit match would not have caused the burn under the victim's chin. He said no evidence was seized from the victim's apartment, other than the curling iron, that reasonably could have caused the burn.

Dr. Pamela Auble, an expert in neuropsychology, testified that she evaluated Petitioner, interviewed him, and administered tests on various dates from February 18, 2000, to May 7, 2003. She conducted a series of neuropsychological tests and said Petitioner showed signs of impairment to his mental flexibility, which was "the ability to take information in, to use it, to sensitize it, to change your behavior according to what information you've . . . received." She said Petitioner was "likely to do dumb things over and over again." She said someone with mental flexibility impairment had "rigid or preservative" behavior, meaning he or she would do wrong things repetitively.

Dr. Auble testified that Petitioner was not malingering, that Petitioner was not invested in the testing at all times, and that Petitioner's scores "might be a little higher than the [scores] she obtained as true abilities." She found Petitioner and Petitioner's family disengaged and avoided negative situations. She said that she did not think Petitioner was intelligent and that his records showed he "struggled in school." She believed Petitioner disengaged because of unpleasantness and difficulty.

Dr. Auble testified that Petitioner's full-scale IQ was seventy-four. Her testimony was that "mental retardation" (now referred to as "intellectual disability" by legislative mandate 2010 Tenn. Pub. Acts 734) was defined as an IQ of seventy or below in conjunction with deficits in adaptive functioning and with onset before the age of eighteen. She said that Petitioner was within the "borderline range" of being intellectually disabled. She said Petitioner's IQ score placed him in the fourth percentile of the population, meaning that ninety-six percent of the population would score better than Petitioner. She said that the average prison inmate IQ was approximately ten points lower than that of the general population and that Petitioner's IQ was at the low end of the scale for prison inmate IQ.

Dr. Auble testified that Petitioner scored higher in the areas of arithmetic and answering questions of general knowledge, such as knowing the directions in which the sun rises and sets. She said Petitioner had difficulty "finding the missing parts of pictures, putting blocks together, [and] arranging pictures into sensible stories." She said that Petitioner received special education services in school and was slow in learning to read. She said that although Petitioner finished the seventh grade, she did not think that Petitioner passed the seventh grade. Petitioner's school records showed that he stopped attending school in the ninth grade. She said Petitioner's "deficit" was "relatively pervasive" and easily detected by interacting with him.

Dr. Auble testified that Petitioner had difficulty going from one idea to the next, or adaptation, and changing his behavior to accommodate changing situations. She said that it would become clear after spending time and working with Petitioner that something was not right and that further investigation was needed. She found no evidence that Petitioner

-32-

was a sociopath, had antisocial personality disorder, was paranoid, psychotic, or had problems with women. She said a person's history was the best predictor of whether they were violent or had an aggressive personality. She concluded that Petitioner's history showed no incidents of violence before the day of the shooting, only a childhood fight.

Dr. Auble testified that Petitioner's deficits affected his judgment and ability to respond to changing situations which caused Petitioner to exercise poor judgment and act recklessly. She concluded that Petitioner's low scores, borderline intelligence, mental rigidity, inability to cope with change and complexities, and difficulty thinking through situations contributed to Petitioner's poor decisions to play with a gun and to leave the scene after the shooting. She said if the victim's death was accidental, the adaptive response was to call for help and said Petitioner's leaving the scene was an example of how his mental deficits impacted his decisions. She said Petitioner left the scene because he did not know what to do.

Dr. Auble testified that she found no evidence Petitioner was involved in satanic worship. Petitioner's family "categorically denied" knowledge of such behavior. She said that if Petitioner was involved in devil worship, she would have expected an indication of paranoia, poor reality, or indications of disturbance but that there were no signs of either. She said her testing showed no signs that Petitioner had a predisposition toward torture. Although she was unsure what would be a predisposition toward torture, she expected it to involve hostility or paranoia.

Dr. Auble recalled a remark in the trial transcript that Petitioner did not show emotion and testified that Petitioner's lack of emotion was characteristic of someone who was limited intellectually, could not process information, and did not understand the situation. She said Petitioner's lack of emotion was also consistent with his family's history of refusing to confront negative situations. She believed Petitioner's lack of reaction was not a lack of remorse but an avoidance of feelings.

On cross-examination, Dr. Auble testified that counsel's reason at the trial for Petitioner's leaving the scene was that Petitioner was afraid he was in trouble. She said, though, no alternative explanation was developed that "this might have been something inside him that affected his behavior, something that he didn't have any real control over." On redirect examination, Dr. Auble testified that Petitioner did not deny being at the scene or being involved in the shooting. Petitioner told her that talking about the shooting "upset him and hurt him" and that he wished the shooting had never occurred. She concluded that Petitioner felt remorse for the shooting.

Harry Ward, Petitioner's half-brother, testified that he recalled Petitioner's receiving a plea offer of twenty-five years, that he encouraged Petitioner to accept the offer, and that Petitioner wanted to accept it. Mr. Ward was incarcerated for a three-year period in 1976, returned to prison in 1981, and remained incarcerated until 2002. He said he spoke to Petitioner about the offer through letters and that he spoke with Petitioner's mother on the telephone.

Constance Branch testified that she met Petitioner at Christian United Baptist Church and that she and Petitioner dated in 1993. She was in high school and living with her parents at the time she dated Petitioner. She said that her parents did not allow her to date young men other than Petitioner, of whom they approved.

Ms. Branch testified that Petitioner was never violent and that Petitioner never gave her the feeling that he would harm her. She said she never saw Petitioner with a gun. She said Petitioner was not in a gang, did not "run the streets," and did not use drugs. She said Petitioner did not take her to places where she should not have been or do anything he should not have been doing. She said Petitioner enjoyed church and was respectful. She stated that she invited Petitioner to attend her church and that Petitioner brought his mother, who later joined the church. She said Petitioner was not the kind of person who would have intentionally harmed anyone. She said Petitioner's defense team never interviewed her.

Ernestine Branch, Constance Branch's mother, testified that she met Petitioner when he attended her church and that she had known Petitioner three to four years at the time of his arrest. She said that she generally did not allow her daughter to date and that she kept "a close eye" on her daughter when she was in high school. She said she allowed her daughter to date Petitioner, though, because he spent time at her house, was respectful, always had good manners, and was the type of man she wanted for her daughter. Her daughter and Petitioner dated for about one year.

Ms. Branch testified that she had not heard about Petitioner's being involved in devil worship "until recently." She said Petitioner never seemed the type of person to be involved in that type of behavior. She stated that if she thought Petitioner was involved in devil worship, she would never have allowed her daughter to date him. She said her daughter would not have wanted to spend time with Petitioner if he were involved in devil worship. She said Petitioner was always kind, respectful, and said, "[Y]es, ma'am, no ma'am." She said she would not have testified at the post-conviction hearing if Petitioner was not kind, respectful, and a nice man. She said she was not interviewed by Petitioner's defense team but would have told them what she knew about Petitioner had they contacted her.

Ophelia Jones, Louise Cowans, Renia Williams, Alfred Campbell, and Oscar Jones testified that Petitioner was a good person who was not violent or in a gang, did not carry a gun or sell drugs, treated women with respect, attended church regularly, and was not involved in satanism. Each witness testified that they were not contacted by trial counsel.

Valma Cowans, Petitioner's aunt, testified that she never knew him to possess a gun or be in a gang. She said Petitioner attended church and helped other people when he could. She stated that although she attended Petitioner's trial, the defense team never contacted her. She said trial counsel ignored her when she attempted to ask questions during the trial. She asked counsel why Petitioner's case was not investigated and why he did not contact more family members. She said that she attempted to give counsel information about Petitioner but that he did not listen and walked away.

Joan Jahi, Petitioner's aunt, testified that Petitioner was well-mannered and a respectful child. She said Petitioner "stayed away from trouble" and was never cruel to other people. She said Petitioner respected and never mistreated women. She said Petitioner "was raised in the church" and never worshiped the devil. She said that Petitioner frequently visited her home and that she would have known if Petitioner was involved in devil worship. She was not contacted by trial counsel. She said that during Petitioner's trial, she overheard counsel state that the defense team was not prepared and that he did not know that "it was going to go as far as it went." On cross-examination, Ms. Jahi testified that she told trial counsel what she knew about Petitioner.

Relo Renee Cowans, Louise Cowans's twin sister and Petitioner's cousin, testified that she never knew Petitioner to be violent or to associate with violent people. She never saw Petitioner with a gun and never knew him to sell drugs. She said Petitioner attended church and showed no signs of being involved with satanic worship. She said Petitioner was kind to all people, including women. She was contacted by the investigator on Petitioner's defense team but was not asked about these topics.

Judge Mark Ward testified that he previously was the Appellate Supervisor for the Shelby County Public Defender's Office and had worked on the appeal of Petitioner's conviction in 1995. He said it was his responsibility to ensure that all cases were timely appealed. He said that he had appealed between fifty and one hundred murder trials. He agreed there were certain aspects of a trial that were fundamental to a defendant's receiving a fair jury trial. He agreed a defendant was entitled to certain fundamental jury instructions, which were important because a trial lawyer increased his or her credibility with a jury when his or her arguments related to a trial judge's jury instructions.

Judge Ward testified that in all criminal cases in Shelby County, trial counsel were required to file a timely motion for a new trial but that trial counsel failed to do so. He agreed that the late filing did not prevent Petitioner's motion for a new trial from being considered by the trial court. He recalled that the State "fought viciously" for the court to conclude that Petitioner's issues were waived but that he convinced the court to consider every issue on the merits. He thought not filing a motion for a new trial by the deadline constituted deficient performance.

Judge Ward testified that he was aware counsel agreed at the trial that Petitioner was guilty of criminally negligent homicide, reckless homicide, or an accidental killing. After reviewing a copy of the jury charge contained in the technical record, the pattern jury instruction on burden of proof, and our supreme court's opinion, Judge Ward said that the burden of proof instruction was not given to the jury at Petitioner's trial. He agreed that the trial court's failure to include this instruction was not included in Petitioner's motion for a new trial. Judge Ward noted that had he realized the instruction was not given, he would have included the issue in Petitioner's direct appeal. He said the jury charge in this case failed to include a criminally negligent homicide instruction. He agreed that at the time Petitioner's case went to trial, trial counsel needed to object to the exclusion of lesser included offenses and that counsel would have been entitled to an instruction on lesser included offenses based on the defense's theory of the case. He agreed that trial counsel could have argued lesser included offenses were raised by the proof at the trial and that counsel did not request a criminally negligent homicide instruction or include the issue in the motion for a new trial. He said that counsel did not request a jury instruction on ignorance or mistake of fact but should have based on the defense's theory of the case. He agreed the defense's theory of the case would have allowed counsel to present evidence of Petitioner's IQ and mental health to support Petitioner's ignorance or mistake of fact. He agreed that counsel did not raise the issue in Petitioner's motion for a new trial.

On cross-examination, Judge Ward testified that courts looked at jury instructions differently at the time of Petitioner's trial. He said he was unsure how an ignorance or mistake of fact jury charge would have applied in Petitioner's case. He said he was aware of only one case from the Tennessee Supreme Court reversing a conviction for failure to instruct a jury on lesser included offenses when the issue was not argued before the Tennessee Court of Criminal Appeals and not included in the brief to the Tennessee Supreme Court.

On redirect examination, Judge Ward testified that he was unsure if a mistake of fact or ignorance jury instruction would be required if testimony showed that Petitioner unloaded the gun and someone loaded the gun but Petitioner thought the gun was unloaded when he killed the victim. He agreed that whether the proof presented at the trial would support

negligence or recklessness would be a jury question if the trial court instructed the jury on the lesser included offenses. He said he would have asked for jury instructions on the lesser included offenses.

Memphis Police Department Lieutenant Timothy Edward Cook, Sr., testified that he was the lead investigator in Petitioner's case. He said he reviewed his personal notes, a partial report from the crime scene investigators, and a merged crime scene report containing three reports from various crime scene investigators. He stated that he did not know the authors of the merged crime scene report. He said that according to the report, the victim was found with a bullet wound to her left ear and that no money or jewelry was in the victim's clothing. He said he examined the victim's body at the scene.

Lieutenant Cook testified that he did not recall finding markings on the victim's neck and that the written supplements to the police report did not mention injuries to the victim's neck. He identified his handwriting on the reports. He agreed a section in the report requested the investigating officers to note unusual observations at the scene. The report contained a section asking about the victim's head, and the report showed that the officers saw a bullet hole in the victim's earlobe. The report showed "none" was written in the section requesting observations about the victim's face. The report showed "none" was written in the section related to the victim's neck. The report showed a line drawn through the section related to the victim's back. Lieutenant Cook said this meant that he did not look at the victim's back because the victim was lying face up on the floor. The report showed "none" was written in the section asking for observations of the victim's hands and upper extremities. A line was drawn through the section related to the victim's buttocks and lower extremities, meaning that Lieutenant Cook did not look at the victim's buttocks and lower extremities.

Lieutenant Cook testified that he was not trained as a crime scene investigator and that crime scene investigators did not work under his supervision. He said a crime scene investigator's function was to collect evidence at a scene and to ensure that everything was documented. He said crime scene investigators "probably" also tried to ensure that nothing contaminated a scene. He said his personal notes of a scene were used as a reference when interviewing witnesses and used to brief other investigators and his supervisors. He said his notes were not a thorough investigation or a supplement to the primary police report.

On cross-examination, Lieutenant Cook testified that when a body was found, it was taken to the Medical Examiner's Office and that the medical examiner performed an autopsy and a thorough inspection of the body. He said the results of the visible inspection were included in the autopsy report. He said he tried not to touch bodies at crime scenes.

On redirect examination, Lieutenant Cook testified that if he saw something unusual at the scene, he "could have" noted it in the supplement. He said that the supplement included information that the victim's neck was covered in blood and that none of the officers disturbed the evidence. He stated that after the victim's body was taken to the Medical Examiner's Office, the body was cleaned and the blood removed. He said bruising and markings would have become more visible after the body was cleaned. He noted in the supplement that he saw a cigarette near the victim's left elbow and an unused match lying in blood near her right elbow. He noted, too, that no exit wound could be found because of the amount of blood.

Retired Memphis Police Department crime scene investigator Frederick Louis Sansom testified that it was his responsibility to photograph the scene, process the scene for fingerprints, collect evidence, take measurements of the scene for a sketch, and ensure the evidence was noted and cataloged. He said that a description of the victim's neck and face were not included in his report but that photographs were taken. He found ricochet marks on the floor and the splash guard behind the stove. His report described the scene and the articles in the room. On cross-examination, Officer Sansom testified that he deferred to the medical examiner for the visual inspection of the victim's body including the victim's injuries.

William Massey, an expert in the field of death penalty litigation, testified that the first task in defending a capital murder defendant was to assemble a defense team, which included co-counsel, an investigator, and a forensic psychologist, and that the next task was to investigate and gather facts. He stated that in addition to investigating the Affidavit of Complaint, obtaining a defendant's arrest record, holding preliminary hearings, and transcribing courtroom proceedings, counsel also had to investigate the State's witnesses, including the witnesses whom the State did not intend to call, defense witnesses, and the defendant. The investigation would be used to develop a theory of defense that would be supported by the evidence. He stated that under the American Bar Association (ABA) Standards, defense counsel in capital cases were under a higher performance standard than in general criminal defense and were required to obtain the defendant's social history and to obtain a forensic psychologist. He said the capital defense team must "gather all information from every source" that can be found and use that information to develop a defense theory.

Mr. Massey testified that it was important for capital defense counsel to meet with the medical examiner because counsel could learn the medical examiner's opinions and the information on which the medical examiner relied to formulate opinions. He said that this allowed counsel to ask the medical examiner questions based on the defense's theory of the case because many times medical examiners were "generally told by police" what occurred and that a medical examiner "will assume things happened in a certain way." He said it was

good for counsel to discuss other possibilities given a particular set of facts, which gave the defense the opportunity to ask the medical examiner on the stand, "Is the defense scenario any less probable than the State's scenario?" He stated that if the medical examiner was not able to state that the defense's theory was just as probable as the State's theory, counsel should obtain an independent expert. He said the ABA and Tennessee Standards required an independent investigation if it was needed. He said counsel could not determine from speaking with one expert if all experts agreed. He said indigent capital defendants had access to funds to retain independent expert witnesses, which only required counsel to meet with the trial court ex parte and make a low threshold showing of need. He said trial courts were lenient with such requests.

Mr. Massey testified that he recalled trial counsel said that he did not retain an independent expert to evaluate Dr. Smith's conclusions because he believed the conclusions were "not absurd." He agreed an "alarm bell" would sound if the State's expert's opinion did not comport with common sense and the evidence but said forensic pathology was "very specialized" and created the need for experts. He stated that if there was "any articulable reason" to hire an expert, the defense team should have had an independent expert review the medical examiner's conclusions. He said if the independent expert came to a conclusion that supported the defendant's theory of the case, counsel could have asked the trial court for increased funding. He said this would have complied with the duty to conduct an independent investigation.

Mr. Massey testified that the independent investigation was important because our adversarial system was based on people taking different positions. He said if only one side presented facts for the jury's consideration, there was a risk of unreliable results. He explained that while counsel could decide not to present proof at the trial, counsel must have first determined the facts before making that decision.

Mr. Massey testified that he had heard of falanga but that it was an uncommon technique in the Memphis area. He said that fact gathering became important once trial counsel learned that the State was relying on the statutory aggravating factor that the murder was heinous, atrocious, or cruel and that the victim was held hostage and tortured. He said that a cigarette and match were on the floor near the victim's body and that counsel should have considered how this fact could have been used at the trial to advance their theory of the case. He said counsel must speak with witnesses and develop the proof, including canvassing the neighborhood.

Mr. Massey testified that witnesses were found by canvassing Pershing Park Apartments, including Mr. Curry, who saw Petitioner and the victim "hugging and laughing" the morning of the shooting. He said this tended to rebut the State's theory of premeditation

and torture. He said counsel could have also argued that because no restraint marks were found on the victim, the victim was not bound or tortured. He stated that Dr. Hudson's testimony that he found yellow green marks on the victim's feet, that he could not conclude there was bruising on the victim's feet, and that the markings could have been caused by "an irregular shoe fitting" also rebutted the State's theory of the case. He said the post-conviction team's independent investigation found witnesses who said the victim wore shoes that caused her feet to hang over the side. He thought it would have been plausible to argue that even if the markings were bruises, they were just as likely to have come from shoes. He stated that an unlit match and unused cigarette found near the victim's body was consistent with the victim attempting to light a cigarette and having a conversation with Petitioner before she was shot. He said these facts could have led the jury to conclude that the markings on the feet were not the result of torture.

Mr. Massey testified that trial counsel's conduct did not satisfy the capital defense requirements under the ABA Standards because they did not perform the necessary investigation or obtain the experts that were supported by the evidence. He said investigation was required for a competent defense and was important due to the allegations of devil worship and torture. He concluded that counsel were not competent based on the facts of the case, Dr. Hudson's testimony about the bruising on the victim's feet, and counsel's failure to consult an independent forensic expert. He also concluded that counsel's failure to investigate with experts, lay witnesses, and the physical evidence at the scene failed to meet the obligations of capital defense in Tennessee. He based his opinion on post-conviction counsel's ability to present witnesses not obtained by trial counsel. He believed that if the proof established at the post-conviction hearing had been presented to the jury and effectively argued at the trial, it was "reasonably probable that the outcome . . . could have been different."

Mr. Massey testified that an independent forensic pathologist was critical at the trial. He said the torture aspect of this case "had to be resolved or at least neutralized" in the defense's presentation to the jury. When asked if it was a tactical decision not to present the jury with proof to rebut the State's evidence, he said,

> I'm not sure that there are instances where not putting on proof can be argued to be for some strategic purpose. In this particular instance, I don't see any evidence of an independent strategic purpose. It just appears that, from counsel's explanation, that Dr. Smith's testimony was not absurd, that they chose not to address the issue or not to go further in their investigation of the issue with experts.

Mr. Massey testified that trial counsel's decision not to develop the forensic evidence failed to meet the ABA Standards because the proper investigation was not conducted. He stated that the type of evidence Dr. Hudson presented could have explained, neutralized, or rebutted the State's theory of torture and given the jury "something to think about" before reaching a verdict. He said minimally competent capital defense in Tennessee required investigation through experts. He believed that Dr. Smith's testimony assisted the jury in reaching a verdict and that counsel should have presented different facts for the jury to conclude torture did not occur. He concluded that had the defense team obtained an expert and developed the evidence related to the State's theory of torture, there was a reasonable probability that the outcome would have been different.

Mr. Massey testified that the allegation of satanic worship was important in the Southern United States because this area was known as the Bible Belt, a highly Christian area. He said the allegation was also important because around the same time as Petitioner's trial, the "West Memphis Three" case, which also involved satanic worship allegations, received intense local and national publicity. He stated that when trial counsel learned of the satanic worship allegation, counsel had to explain, rebut, or exclude the information from the trial. He recalled that counsel opened the door to allowing the allegation into evidence and acknowledged that all counsel had opened the door at some point in their careers. He said, however, that a reasonable degree of preparation would have made counsel aware that he was "flirting with . . . opening the door . . . ."

Mr. Massey testified that trial counsel could have filed a motion in limine addressing the satanic worship allegation before the trial. He said that it would have been "appropriate and proper" to address it before the trial under Tennessee Rules of Evidence 608, 610, 401, 402, 403, and 404. He acknowledged that counsel objected to the State's questioning Mr. Shaw about the satanic worship under Rules 608, 403, and 404 at the trial but said that a pretrial motion was the best approach because it would allow the parties to know whether the allegation could be used at the trial. He acknowledged that counsel's failure to challenge the allegation before the trial was not deficient performance.

Mr. Massey testified that there was information to "dilute" the impact of the satanic worship allegation, including Mr. Shaw's learning the allegation from Petitioner's aunt, who heard the allegation came from the victim's family. He noted Mr. Shaw also heard the allegation from the prosecutor, who asked Mr. Shaw if he knew Petitioner was involved in satanic worship. He said that counsel could have been more aggressive in showing how Mr. Shaw learned of the allegation and that counsel could have neutralized or rebutted the allegation by showing it originated from the victim's family, who were grieving and angry. He said that had counsel shown the allegation's origin, it was probable that the jury would not have concluded that Petitioner worshiped the devil. He said that although the ABA

-41-

Standards did not address whether minimally competent counsel should have cross-examined Mr. Shaw to show the allegation's origin, he believed this information would have helped the jury conclude Petitioner was not involved in satanism. He could not think of a strategic reason for not asking Mr. Shaw questions to show that the allegation originated from the victim's family, and he said counsel's question, "Do you know any of this of your own personal knowledge," was "legalese" and meaningless to a jury.

Mr. Massey testified that he believed trial counsel should have presented witnesses to rebut the satanic worship allegation and that there were witnesses who contradicted the State's evidence. He could not think of a tactical reason for trial counsel's failure to present available witnesses to testify that Petitioner did not worship the devil. He said the testimony of family and friends could have established that Petitioner went to church and showed compassion for other people and led the jury to conclude that he was not involved in satanism. He thought the failure to present evidence that Petitioner attended church failed to meet the ABA and Tennessee Standards. He concluded that had the defense team investigated the allegation, developed the information, and presented witnesses, it was reasonably probable that the outcome of the trial would have been different. He believed the State's unrebutted theory of torture and allegation of satanic worship caused "tremendous damage" to the jury's perception of Petitioner and how it received the facts.

Mr. Massey testified that a defense theory of accident or mistake of fact could have been effective with a jury because showing that the defendant made a mistake and did not intend to kill the victim would have given the jury the opportunity to find the defendant not guilty or guilty of a lesser included offense. His believed accidental shooting or mistake of fact was a good defense in this case and said the witness who saw Petitioner and the victim hugging the morning of the shooting was more consistent with an accident than premeditation for a satanic purpose. He said the unlit cigarette and unused match found near the victim's body was also more consistent with the victim preparing to light a cigarette at the time she was shot rather than being tortured.

Mr. Massey testified that juries liked hearing from defendants and that it helped the defendant if there were witnesses who could corroborate the defendant's testimony. He said corroborating witnesses were available but not presented to the jury, and although the witnesses were helpful and hurtful, it was counsel's job to evaluate witnesses and decide whether to present them to the jury. He stated that under the ABA Standards, however, counsel must first investigate the witnesses and their information before making a decision to present them to the jury. He concluded counsel's failure to investigate and find corroborating witnesses failed to meet the ABA and Tennessee Standards. He said that because post-conviction counsel found corroborating witnesses years after Petitioner's trial, he believed the witnesses were available and could have been found with the exercise of

reasonable diligence at the time of Petitioner's trial. He said "but for" counsel's failure to find and investigate the witnesses and evaluate if they helped Petitioner's case, there was a reasonable probability that the outcome of the of the trial would have been different.

Mr. Massey testified that evidence that none of the victim's children were harmed could have been used to show an accidental shooting and to rebut the State's theories of premeditation and satanic worship. He agreed counsel could have established on cross-examination that it made more sense to commit a premeditated murder while only the intended victim was present. He said evidence that a witness saw the victim and Petitioner playing with a gun the day of the shooting and that the witness played with the gun might have been important because it corroborated Petitioner's trial testimony and his theory of the case. He concluded that this information was the type of evidence that a minimally competent lawyer should have presented under ABA and Tennessee Standards and that the outcome of the trial could have been different had counsel found, interviewed, evaluated, and presented the evidence to the jury. Mr. Massey believed there was a cumulative effect with regard to trial counsel's errors in presenting Petitioner's case to the jury.

Mr. Massey testified that a jury instruction on the burden of proof was important because studies showed that jurors looked to the trial judge for guidance and that it was important for counsel to make statements consistent with the trial judge's instructions. He said the lack of jury instructions on mistake of fact or accident, reckless homicide, and negligent homicide were important because the defense's theory of the case was an accidental shooting. He said the evidence related to the witness's seeing the victim and Petitioner hugging the morning of the shooting, the unused cigarette and unlit match, and Petitioner, the victim, and Mr. Curry playing with a gun the morning of the shooting would have obligated the trial judge to instruct the jury on accident or mistake of fact. He added that Mr. Curry's testimony that he heard a gunshot a short time after he saw the victim and Petitioner hugging supported instructions on accident, mistake of fact, and reckless homicide.

Mr. Massey testified that evidence of Petitioner's "borderline" IQ was relevant to rebut premeditation and to support recklessness or negligence and that a jury was allowed to consider Petitioner's low IQ in determining Petitioner's intent. He said, though, other facts omitted from the defense's presentation were more compelling than Petitioner's IQ score. He agreed that based on Petitioner's IQ score, there was a valid argument that Petitioner did not appreciate the consequences of his conduct. He believed that failure to investigate Petitioner's IQ under an accidental shooting theory was deficient under Wiggins v. Smith, 539 U.S. 510 (2003), and the ABA Standards. He stated, though, that the failure to investigate Petitioner's IQ would probably meet Tennessee's minimal competence standard but that this was a developing area of law in which Wiggins applied. He stated that taking the other favorable evidence not used at the trial into consideration with Petitioner's

IQ and Dr. Auble's conclusions, there was a reasonable probability of a different outcome at the trial.

Mr. Massey testified that there was not a per se rule in Tennessee that failure to investigate a defendant's IQ was deficient performance when the theory of the case was mistake of fact or negligence. He said, though, that this type of investigation was taught in Tennessee and that obtaining a defendant's IQ was part of the basic independent investigation required for effective criminal defense. He said Tennessee public defenders were holding ex parte hearings to obtain funding for experts, including psychologists.

Mr. Massey testified that trial counsel had a duty to inform his client about plea offers, that the twenty-five-year offer should have been discussed with Petitioner in a prompt manner, and that counsel needed to spend more time discussing the offer with a defendant who had a low IQ and was unfamiliar with the criminal justice system. He noted that fifteen minutes was a very short time to discuss an offer. He stated that telling the client the substance of the offer is only part of keeping the client informed under ABA Guidelines, which includes keeping the client apprised of the theory of the case, the proof that supports the chosen theory, the State's evidence, how the defense can rebut the State's evidence, and the probability of the client's success at a trial. He said keeping a client fully informed was a continuing discussion. He suggested his clients discuss the decision to accept an offer with family and recommended they have as much time as possible to consider it. He believed that waiting until the night before the twenty-five-year plea offer expired and spending fifteen minutes with Petitioner discussing the offer was not minimally competent counsel in a capital murder case.

On cross-examination, Mr. Massey testified that the satanic worship allegation only came out during the testimony of Mr. Shaw at the trial and that the record showed that the State asked to approach the bench and asked the trial judge for permission to impeach Mr. Shaw's favorable character testimony with the "rumor about satanic worship." He stated that he did not speak with trial counsel, trial co-counsel, original counsel, or original co-counsel and that he did not know trial counsel spoke with Dr. Smith about his findings and obtained pictures of the autopsy. He agreed Dr. Hudson found evidence that some of the victim's injuries were consistent with falanga but said the injuries were also consistent with being caused by the victim's shoes. He said this line of questioning was not fully examined during Dr. Smith's cross-examination.

Mr. Massey acknowledged that Petitioner first made the statement that the victim died playing Russian roulette and that this statement was inconsistent with Petitioner's trial testimony. He agreed that counsel had to take the inconsistent statements into consideration when presenting a case to a jury and that Petitioner described the victim's death at the trial.

-44-

Mr. Massey testified that although a forensic psychologist was not required on a capital defense team, it was his practice to include a forensic psychologist because counsel needed the information they brought to light. He said, though, that to comply with "the new ABA guidelines and 4.1, it required at least one team member to be qualified to screen for mental or psychological disorders or impairments." He said a forensic psychologist was qualified for that duty. He said that counsel's failure to hire a forensic psychologist was not necessarily the ineffective assistance of counsel but that it depended on whether the lack of information that could have been learned from a forensic psychologist caused prejudice. He stated that although counsel may have concluded that Petitioner did not suffer from mental defects and that there was no history of mental illness or problems, counsel should have retained a forensic psychologist because this was a capital case. He said courts and the ABA were "telling lawyers . . . in death cases, . . . to take these extra precautions." He said, though, that he would not present false information to a court to obtain funds for a forensic psychologist.

## POST-CONVICTION COURT'S FINDINGS

Upon this evidence, the post-conviction court granted relief on the sentencing phase of Petitioner's trial on the ground that he received the ineffective assistance of counsel because of a serious lack of investigation, preparation, and presentation of mitigation. The post-conviction court denied relief regarding the guilt phase of Petitioner's trial.

The post-conviction court concluded that counsel were not ineffective by opening the door to allow the State's questioning of Mr. Shaw about the satanic worship allegation and found that Mr. Shaw was a favorable witness and possibly the defense's only opportunity to "bolster Petitioner's character . . . through a State witness." The court refused to find that counsel "failed to exercise good judgment in running the risk he did in order to reap needed benefits." The court noted that counsel objected to the mentioning of satanic worship, that a jury-out hearing was held, and that satanic worship was only discussed during the State's redirect examination of Mr. Shaw. The court found that the jury was instructed on the permissible limited use of the evidence both immediately following the questioning and again in its jury instructions. The Tennessee Supreme Court upheld the questioning on direct appeal. See Nesbit, 978 S.W.2d at 881-84.

The post-conviction court concluded that counsel were not ineffective by failing to object to the satanic worship evidence in light of the "West Memphis Three" case. The court found that nothing in Petitioner's case was similar to the facts of the "West Memphis Three" case. In that case, the victims were found in a creek, hands and feet bound, and stabbed. One of the victims had his genitals removed, none of the victims were burned, and the defendants and the victims were Caucasian. The court found the mentioning of satanism

-45-

was used to impeach Mr. Shaw's knowledge of Petitioner's peacefulness and was not substantive evidence.

The post-conviction court concluded that Petitioner's contention that counsel were ineffective by failing to be prepared to present rebuttal evidence of satanic worship after they were given pretrial notice was without merit. The court found that although the allegation of satanic worship originated from the victim's family, the evidence was only used to impeach Mr. Shaw's credibility and that an immediate instruction was given to the jury on the permitted use of the evidence.

The post-conviction court rejected Petitioner's contention that counsel were ineffective by failing to investigate and present evidence of diminished capacity. The court found that no testimony was elicited from Dr. Auble that Petitioner was unable to form the requisite criminal intent and that Dr. Auble would not have been allowed to testify during the guilt phase of the trial. The court found that Petitioner had an IQ of seventy-four, which was "borderline [intellectually disabled]" but that the issue was without merit.

The post-conviction court concluded that counsel were not ineffective by failing to request proper jury instructions. The court found that the reasonable doubt and moral certainty instruction was a correct statement of law. The court rejected Petitioner's contention that counsel were ineffective by failing to object to the instruction that required the jury to presume the truthfulness of the witnesses and stated the instruction did not violate the jury's ability to assess witness credibility. The court found that although the jury was not charged with Tennessee Pattern Jury Instruction Criminal 2.02 as suggested by Petitioner, the jury was charged with the correct burden of proof. The court found Petitioner was not prejudiced.

In addressing Petitioner's contention that counsel were ineffective by failing to request a jury instruction on ignorance or mistake of fact, the post-conviction court noted Petitioner gave four different statements. The post-conviction court found Petitioner made an oral statement to Mr. Shaw and Ms. Cynthia Nesbit that the victim shot herself playing Russian Roulette. The court found Petitioner also stated that he pointed the gun and looked at the gun to see which way the revolver was going to turn when it fired. The court found that Petitioner told Officer Cook that the victim began playing with the gun, pulled the trigger several times with her left hand, and fired the gun when she pulled the trigger the last time. The court found that Petitioner also told Officer Williams that he shot the victim but claimed it was an accidental shooting. The court noted Petitioner's testimony contradicted his written statement about the events leading up to the shooting.

The post-conviction court found that counsel sought a reckless homicide conviction and said that an instruction on ignorance or mistake of fact would have put the jury in a position of "all or nothing." The court commented that if Petitioner "believed the gun was unloaded, he could not have [been] convicted of reckless homicide, or any other lesser offense, because if the gun were in fact unloaded as he believed, there would have been no killing, and the jury would have [had] to acquit."

The post-conviction court found that Quinton Curry's testimony that he saw Petitioner and the victim "laughing or 'hugging up'" the morning of the shooting and that Petitioner allowed Mr. Curry, "a [intellectually disabled] boy . . . to fire his gun," contradicted Petitioner's statement that he unloaded the gun the night before the shooting. The court found that counsel did not request an instruction on ignorance or mistake of fact because he did not think either applied. The court identified evidence of the victim's burns and bruises and found it would have been unlikely for the jury to follow an instruction on ignorance or mistake of fact and negate premeditation and deliberation with "clear proof" of the abuse to the victim. The court said that the soot marks on the victim's chin resembled those that resulted from holding a match flame under a spoon and did not result from an accident with a curling iron. The court found that "depending upon the theory of the defense, a reckless killing by reckless[ly] playing with the gun would be more viable than asking a jury to find the [Petitioner] not guilty of all charges because he thought the gun was unloaded." The court found that there was "overwhelming proof that there was recent abuse of the victim by Petitioner prior to her killing" and that defense counsel's failure to request a jury instruction on ignorance or mistake of fact was not deficient performance and did not prejudice Petitioner.

The post-conviction court concluded that counsel were not ineffective by failing to request a criminally negligent homicide jury instruction for lack of prejudice to Petitioner. The court found that criminally negligent homicide should have been charged without regard to whether trial counsel requested it. The court found, though, that by rejecting the instruction on second degree murder and by convicting Petitioner of first degree murder, the jury rejected all lesser included offenses, including criminal negligent homicide.

The post-conviction court concluded that Petitioner's contention that counsel were ineffective by failing to develop witnesses that Petitioner spared the victim's children who were in the apartment at the time of the killing was without merit. The court noted that the witness who found the victim and the children testified at the trial. The court found that "at least one child told the police . . . that 'Red hurt Mommy" and that Ms. Geiser testified that Dr. Smith said "one of the children stated that he had seen the defendant burning the victim." The court concluded that it was obvious that Petitioner did not kill the victim's children and

that had the children testified, they "would have impeached Petitioner's credibility that the shooting was accidental."

The post-conviction court concluded that Petitioner's contention that counsel were ineffective by failing to show the victim's recklessness and character was without merit. The post-conviction court found Petitioner presented no proof showing the victim was reckless, careless, or contributed to her own death. The court concluded that Petitioner was not prejudiced by counsel's failure to show the victim's drug use and noted that the only proof of the victim's drug use was offered by Cynthia Nesbit, who the court discredited. The court also noted drugs were not found in the victim's blood.

The post-conviction court concluded that Petitioner was not prejudiced by co-counsel's showing the jury a photograph of the victim that was excluded by the court. The court found that co-counsel picked up a photograph during her closing argument that was excluded after the defense objected. The court noted co-counsel believed the photo was received as an exhibit, but the court reporter confirmed that the photograph was not in evidence. The court concluded co-counsel made an "unintended mistake" that did not prejudice Petitioner.

The post-conviction court concluded that counsel was not ineffective by conveying the twenty-five-year plea offer to Petitioner the day before the offer's expiration. The court said counsel's testimony that he received the offer on November 23, 1993, that he discussed the offer with Petitioner on January 5, 1994, and that the State revoked the offer the following day in court was supported by counsel's time sheets and notes. The court found counsel did not recall the reason for not conveying the offer immediately to Petitioner and that Petitioner rejected the offer because he claimed the shooting was accidental. The court found counsel met with the State after the offer was revoked but the State only offered life imprisonment. The court noted that counsel said he did not think Petitioner would have accepted the twenty-five-year offer even if it had been conveyed to Petitioner in November.

The post-conviction court found that Petitioner told his mother, Annette Jones, that he wanted to accept the offer and that she told trial counsel of Petitioner's desire two days later during the ice storm. The court took judicial notice that the ice storm began on February 9, 1994, but that Ms. Jones "seemed confused, not knowing whether her son told her he was going to trial or pleading guilty the day the jury was being selected." The court found Ms. Jones discussed the offer with Petitioner after it was revoked because Petitioner rejected the offer the day trial counsel conveyed it and because the ice storm was one month after the offer was revoked.

The post-conviction court credited trial counsel's testimony and took judicial notice that November 23, 1993, the date the plea offer was received from the State, was the Tuesday before Thanksgiving. The court found that counsel's failure to convey the offer immediately because of another trial during the three weeks after the Thanksgiving break but before the courts went into their Christmas break did not "seem so out of the ordinary as to render representation deficient . . . ." The court noted that Petitioner chose not to testify at the post-conviction hearing and that Petitioner presented no other credible proof that had the offer been presented to him before January 5, 1994, he would have accepted it.

The post-conviction court discredited Harry Ward's testimony that Petitioner told him that he wanted to accept the twenty-five-year plea offer and noted that there was no evidence showing when Mr. Ward and Petitioner spoke about the offer.

The post-conviction court discredited co-counsel's testimony and found that it could not rely on her testimony that she was present when trial counsel conveyed the plea offer to Petitioner and that Petitioner was "adamant" about rejecting the offer. The court said co-counsel admitted her memory was not clear about "when, where or why she was present at the meeting" and her case file did not support her testimony.

The post-conviction court found that Dr. Hudson "agreed with Dr. Smith in his analysis, except added things that 'could have been' and were 'possible' and 'conceivable.'" The court found that Dr. Hudson could not state with a reasonable degree of medical certainty that the victim was tortured but stated the victim's burns "may have been 12 to 24 hours old." The court concluded, though, that "the photographs of the neck wounds . . . dispelled the notion that these burns, at most 2 hours old, were random in nature." The post-conviction court disagreed with Dr. Hudson's conclusion that the victim's gunshot wound could have been caused as Petitioner described at the trial because the court found that it was unlikely that he held the gun the way he demonstrated at the trial.

The post-conviction court found that Dr. Hudson could not state definitively whether the victim was tortured and that it was possible the markings on the victim's feet were caused by her shoes. The court noted Dr. Hudson was disadvantaged in his evaluation because he did not have the opportunity to examine the victim. The court found that Dr. Hudson would "have to take into account the medical examiner's report which indicated that the children told the police "Red burned by Mama." The court found that Dr. Hudson was

> handicapped by not being able to see the actual body of the victim, that one undesignated burn may have been from 12 to 24 hours old, rather than two hours old, and that he was not prepared to give an opinion to a reasonable degree of medical certainty that the victim was tortured. Other than that, he

did not contradict Dr. Smith.  All other findings by Dr. Smith were consistent with the evidence.

The post-conviction court found that counsel were not deficient by failing to present a forensic pathologist to rebut Dr. Smith's testimony and that Petitioner was not prejudiced by this failure.  The court stated, "Another pathologist . . . would merely have confirmed the time frame of all the burns save one [and] Petitioner being the only person besides the children to have been with the victim during this time, by his own admission."  The court noted that trial counsel testified that Dr. Smith's "explanation of the situation wasn't absurd" and that he thought Dr. Smith's conclusions were "within the realm of what happened."  The court found that co-counsel went with counsel to interview Dr. Smith and that she thought an independent forensic pathologist was not needed.  The court found the issue meritless.

The post-conviction court rejected Petitioner's claim that counsel were ineffective by failing to investigate and present evidence of an accidental shooting.  The court found that the only persons present during the shooting were Petitioner, the victim, and the victim's children, who stated that "Red burned Mama" and "Red did it."  The court stated that "there were obviously no witnesses to the shooting [that] turned up in the investigation of this case, which could have been called at [the] trial."

The post-conviction court discredited the testimony of Cynthia Nesbit and James Shaw showing that Petitioner said the shooting was accidental and found that this was not new information.  The court stated that "it was obvious  . . .  that both witnesses were extremely biased in favor of Petitioner, and were exhibiting 'selective memories' and making statements that were untrue."  The court noted that at the trial, Mr. Shaw omitted Petitioner's first statement that the victim shot herself playing Russian roulette and was impeached with his prior statement.  The court noted that at the post-conviction hearing, Mr. Shaw also denied Petitioner's stating that the victim shot herself playing Russian roulette and denied hearing the allegation of Petitioner's involvement in satanic worship from anyone other than the prosecutor.  The court found Mr. Shaw was interviewed by counsel before the trial.

The post-conviction court found Cynthia Nesbit's testimony contradicted Mr. Shaw's testimony regarding Petitioner's statement that the victim shot herself playing Russian roulette, that she told Petitioner to tell the truth, and that she had Petitioner describe the shooting.  The court discredited her testimony that she did not hear Petitioner's stating that the victim died playing Russian roulette and said that even if her testimony were credible, it added nothing to the evidence.  The court also discredited her testimony that the victim burned herself with a curling iron previously and said her testimony that she saw the victim smoke marijuana was irrelevant because the victim's toxicology analysis was negative for drugs and alcohol.

The post-conviction court found that Fred Nesbit's testimony about Petitioner's obtaining the gun from Ashley Nesbit "somewhat contradicted" Petitioner's testimony at the trial and did not add to his defense. The post-conviction court noted the State could have used Fred Nesbit's testimony to show that Petitioner associated with intoxicated drug dealers.

The post-conviction court rejected Petitioner's contention that counsel were ineffective by failing to investigate and present evidence that the victim was not afraid of Petitioner before the shooting. The court found that Quinton Curry seemed confused during his testimony and that it was obvious he was intellectually disabled. The court found Mr. Shaw's testimony that he heard one gunshot in the morning and another in the afternoon contradicted Mr. Curry's testimony that he shot the pistol in the morning and heard a second gunshot minutes later. The court concluded that if counsel had presented this testimony at the trial, it would have been damaging to Petitioner's statement that "he was 'fumbling' with the gun, watching the cylinder turn, not knowing it was loaded when it fired by accident." The court concluded that Petitioner's testimony that he thought he unloaded the gun and placed the bullets on the refrigerator the night before the shooting was inconsistent with Mr. Curry's testimony because Petitioner would have had to load at least one bullet into the gun to allow Mr. Curry to fire it. The court found that Mr. Curry's seeing the victim and Petitioner hugging the morning of the shooting only showed that they "were getting along that morning, somewhere over four hours before the victim was killed."

The post-conviction court concluded that counsel were not ineffective by failing to show that Detective Cook and Officer Sansom did not observe any marks on the victim's neck while at the scene. The court concluded that their testimony would not have helped Petitioner's defense. The court said Drs. Smith and Hudson agreed the burns were caused hours before the victim's death and could not have been inflicted after her body was removed from the scene. The court found that the jury would have understood the officer's failure to document the burns on the victim's body because of the blood and hair covering the wounds.

The post-conviction court found that based on the testimony of trial counsel, Ms. Glenn, and Ms. Geiser, all the State's witnesses, except Tracey Davis, were interviewed before the trial. The court noted that counsel's efforts to find Ms. Davis were documented in their file and said that although the officers were not interviewed before the trial, counsel had copies of their reports. The court found that the additional witnesses presented at the post-conviction hearing to show counsel's incomplete investigation "added nothing to Petitioner's defense, and in some instances . . . hurt the defense." The court concluded counsel were not ineffective by failing to investigate, prepare, and present witnesses at the trial. This appeal followed.

**STANDARD OF REVIEW & INEFFECTIVE ASSISTANCE OF COUNSEL**

The burden in a post-conviction proceeding is on Petitioner to prove his grounds for relief by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f) (2012). On appeal, we are bound by the post-conviction court's findings of fact unless we conclude that the evidence in the record preponderates against those findings. Fields v. State, 40 S.W.3d 450, 456-57 (Tenn. 2001). Questions regarding the credibility of the witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the trial judge. Henley v. State, 960 S.W.2d 572, 578 (Tenn. 1997). Because they relate to mixed questions of law and fact, we review the post-conviction court's conclusions as to whether counsel's performance was deficient and whether that deficiency was prejudicial under a de novo standard with no presumption of correctness. Fields, 40 S.W.3d at 457. Post-conviction relief may only be given if a conviction or sentence is void or voidable because of a violation of a constitutional right. Tenn. Code Ann. § 40-30-103 (2012).

Under the Sixth Amendment, when a claim of ineffective assistance of counsel is made, the burden is on Petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial. Strickland v. Washington, 466 U.S. 668, 687 (1984); see Lockhart v. Fretwell, 506 U.S. 364, 368-72 (1993). In other words, a showing that counsel's performance fell below a reasonable standard is not enough because Petitioner must also show that but for the substandard performance, "the result of the proceeding would have been different." Strickland, 466 U.S. at 694. The Strickland standard has been applied to the right to counsel under article I, section 9 of the Tennessee Constitution. State v. Melson, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

A petitioner will only prevail on a claim of ineffective assistance of counsel after satisfying both prongs of the Strickland test. Henley, 960 S.W.2d at 580. The performance prong requires a petitioner raising a claim of ineffectiveness to show that the counsel's representation fell below an objective standard of reasonableness or "outside the wide range of professionally competent assistance." Strickland, 466 U.S. at 690. The prejudice prong requires a petitioner to demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. A reasonable probability means a "probability sufficient to undermine confidence in the outcome." Id. "A reasonable probability of being found guilty of a lesser charge, or a shorter sentence, satisfies the second prong in Strickland." State v. Zimmerman, 823 S.W.2d 220, 225 (Tenn. Crim. App. 1991)

In Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975), our supreme court decided that attorneys should be held to the general standard of whether the services rendered were

"within the range of competence demanded of attorneys in criminal cases." Further, the court stated that the range of competence was to be measured by the duties and criteria set forth in Beasley v. United States, 491 F.2d 687, 696 (6th Cir. 1974), and United States v. DeCoster, 487 F.2d 1197, 1202-04 (D.C. Cir. 1973). Baxter, 523 S.W.2d at 936. Also, in reviewing counsel's conduct, a "fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689; see Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). Thus, the fact that a particular strategy or tactic failed or even hurt the defense does not, alone, support a claim of ineffective assistance. Cooper v. State, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992). Deference is made to trial strategy or tactical choices if they are informed ones based upon adequate preparation. See DeCoster, 487 F.2d at 1201; Hellard, 629 S.W.2d at 9.

Criminal defendants are "not entitled to perfect representation, only constitutionally adequate representation." Denton v. State, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, '[w]e address not what is prudent or appropriate, but only what is constitutionally compelled.'" Burger v. Kemp, 483 U.S. 776, 794 (1987) (quoting United States v. Cronic, 466 U.S. 648, 655 n.38 (1984)). Notwithstanding, we recognize that "[o]ur duty to search for constitutional error with painstaking care is never more exacting than it is in a capital case." Id. at 785.

**ANALYSIS**

**I.  INEFFECTIVE ASSISTANCE OF COUNSEL**

Petitioner contends that counsel were ineffective by failing to conduct a pretrial investigation, specifically by failing (a) to have Petitioner examined by a mental health professional; (b) to convey the twenty-five-year plea offer to Petitioner diligently; (c) to interview witnesses from the scene; (d) to interview family and friends of Petitioner; and (e) to investigate the victim.  The State initially responds that Petitioner has failed to offer any argument on appeal that the post-conviction court erred in its findings of fact and conclusions of law and, therefore, has waived all issues raised on appeal under Tennessee Court of Criminal Appeals Rule 10(b).  The State further relies upon Tennessee Rule of Appellate Procedure 27(a)(7), which requires that the appellant's brief include an argument setting forth "the contentions of the appellant with respect to the issues presented, and the reasons therefore, including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record. . . ."  In the argument portion of his brief, Petitioner cites to the appellate record in support of his contentions that trial counsel were ineffective and argues that the post-conviction court erred in finding otherwise.  By

doing so, Petitioner has complied with the requirements of Tennessee Rule of Appellate Procedure 27(a)(7) and Tennessee Court of Criminal Appeals Rule 10(b). We decline to conclude that Petitioner has waived his issues.

## A. Failure to Conduct Mental Examination

Petitioner contends that counsel were ineffective by failing to have him evaluated by a mental health professional and by failing to locate his medical and school records. He argues that such evidence would have supported a diminished capacity defense.

In denying relief, the post-conviction court noted Petitioner raised this issue in the "Preliminary Amended and Supplemental Petition for Post-Conviction Relief" filed on March 16, 2001, and the "Final Amended Petition for Post-Conviction Relief" filed on January 12, 2007. Petitioner is not entitled to relief on this issue.

The record of the post-conviction proceedings reflects that trial counsel would not have had the time or resources to conduct the investigation performed by post-conviction counsel after trial. While not conclusive in and of themselves, limitations of time and resources are factors which should be considered when determining whether to grant post-conviction relief. See Strickland, 466 U.S. at 681. "[C]ourts must recognize that counsel does not enjoy the benefit of unlimited time and resources." Chandler v. United States, 218 F.3d 1305, 1314 n.14 (11th Cir. 2000) (citing Rogers v. Zant, 13 F.3d 384, 387 (11th Cir. 1994)). "Every counsel is faced with a zero-sum calculation on time, resources, and defenses to pursue at trial." Id.

In the present case, Petitioner was indicted for the offense on July 22, 1993. The trial began one year and seven months later on February 21, 1995. Petitioner filed his pro se petition for post-conviction relief in August of 1999. In it, he stated that two attorneys from the Office of the Tennessee Post-Conviction Defender "had assisted in drafting or given advice regarding [his] petition for post-conviction relief." The Office of the Post-Conviction Defender initially was appointed to represent Petitioner but later withdrew. Private counsel then were appointed to represent Petitioner. On May 19, 2003, the day in which the post-conviction hearing began, Petitioner filed his second amended and supplemental post-conviction petition.

As noted by the post-conviction court, an entire week in 2003 was reserved for the hearing. However, "several additional witnesses had still not been located or served, and Dr. Pam Auble, the neuropsychologist, had not yet concluded her testing, which necessitated a continuance." Thus, even though the petition had been pending for approximately three years and nine months, the investigation was not complete.

The next hearing did not occur until December 16, 2004, during which Dr. Auble testified. Dr. Auble said she met with and administered testing to Petitioner on various dates beginning on February 18, 2000, approximately six months after Petitioner filed his pro se petition. Dr. Auble's final visit with Petitioner was on May 7, 2003, shortly before the first hearing. Dr. Auble's report of her evaluation is dated May 15, 2003, approximately three years and nine months after the post-conviction proceedings began.

Trial counsel cannot be faulted or found to have rendered deficient performance for failing to uncover information expressed by Dr. Auble when it took more than three years for post-conviction counsel to have Petitioner evaluated by this expert. It is inconceivable that a trial in a capital case would be delayed for more than three years after indictment for defense counsel to obtain the evaluation of Dr. Auble. There is no evidence in the record that the trial court in this case would have permitted such a delay.

Furthermore, Dr. Auble's testimony did not support Petitioner's claim of diminished capacity. Before the trial in February 1995, this court released the opinion in State v. Phipps, 883 S.W.2d 138 (Tenn. Crim. App. 1994), recognizing the concept of diminished capacity as "a rule of evidence which allows the introduction of evidence to negate the existence of specific intent when a defendant is charged with a specific intent crime." Phipps, 883 S.W.2d at 143 (quotations omitted). Although evidence of a defendant's diminished capacity does not constitute a defense capable of excusing or defeating a criminal charge, such evidence is relevant in determining the defendant's mens rea. Id. Such evidence "is an attempt to prove that the defendant, incapable of the requisite intent of the crime charged, is innocent of that crime but may well be guilty of a lesser one." Id.

Dr. Auble did not testify that Petitioner suffered from a mental disease or defect making him incapable of forming the requisite intent for first degree murder. Petitioner presented no evidence at the post-conviction hearing to support a finding of diminished capacity. The evidence established that Petitioner's intellectual functioning was substandard but did not establish that Petitioner was incapable of premeditation. Petitioner is not entitled to relief on this issue.

## B. Failure to Convey the Twenty-Five-Year Plea Offer Promptly and Diligently

Petitioner contends counsel were ineffective by failing to convey promptly and explain diligently the twenty-five-year plea offer. Petitioner argues that by waiting until the day before the offer expired and spending only fifteen minutes explaining the offer, counsel failed to provide him with sufficient time and opportunity to consider it. The post-conviction court found that counsel's failure to convey the offer immediately because of another trial

between Thanksgiving and Christmas was not "so out of the ordinary as to render representation deficient."

Although we acknowledge counsel's heavy caseload as an assistant district public defender, that alone cannot excuse prompt and diligent communication with a client, especially a client who is eligible for the death penalty. Counsel cannot neglect one client for the benefit another. We also understand that the holiday season can bring hectic schedules and increased stress, but that, too, cannot excuse the failure to communicate with clients. We conclude that counsel's failure to convey the twenty-five-year plea offer in November 1993 was deficient performance.

We conclude, however, that the deficiency did not result in prejudice. In rejecting Petitioner's claim, the post-conviction court reviewed the testimony of trial counsel, co-counsel, Annette Jones, Cynthia Nesbit, and Harry Ward. After noting the various deficiencies in the testimony of other witnesses, the post-conviction court accredited the testimony of trial counsel, noting that his testimony was supported by his time sheets and notes in his file. Trial counsel testified that he had previously discussed possible outcomes with Petitioner, including a possible plea, and that Petitioner maintained he would not accept a plea. Trial counsel stated Petitioner continued to take this stance when trial counsel conveyed the twenty-five-year offer to him. Trial counsel believed Petitioner understood the terms of the offer. When in court the next day, he again discussed the offer with Petitioner, who again refused to accept it. The State then revoked the offer. Trial counsel did not agree that Petitioner possibly would have accepted the offer had he conveyed the offer to Petitioner when he received it.

Petitioner did not testify at the post-conviction hearing, and the post-conviction court found Petitioner presented no credible evidence that he would have accepted the plea if it had been presented sooner. The evidence supports the findings of the post-conviction court. Petitioner is not entitled to relief with regard to this issue. See State v. Garrison, 40 S.W.3d 426, 431-32 (Tenn. 2000) (holding that although counsel was deficient in failing to convey a plea offer, prejudice established only if evidence showed that the defendant would have accepted the plea if properly conveyed).

## C. Failure to Interview Witnesses from the Scene

Petitioner contends that counsel were ineffective by failing to interview witnesses from the crime scene, including Fred Nesbit, Jr., Quinton Curry, Kareem Curry, Cynthia Nesbit, James Shaw, Tracey Davis, and Patrick Nesbit. The testimony of each witness falls within one or more of the following categories: (1) Petitioner's obtaining the gun; (2) Petitioner's possession of the gun on the morning of the shooting; (3) Petitioner's actions and

statements following the shooting; and (4) Petitioner's actions toward the victim before the shooting.

Although trial counsel does not have an absolute duty to investigate particular facts or a certain line of defense, counsel does have a duty to make a reasonable investigation or to make a reasonable decision that makes a particular investigation unnecessary. Strickland, 466 U.S. at 691. Counsel is not required to interview every conceivable witness. See Hendricks v. Calderon, 70 F.3d 1032, 1040 (9th Cir. 1995). Furthermore,

> no particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel. Rather, courts must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct, and judicial scrutiny of counsel's performance must be highly deferential.

Roe v. Flores-Ortega, 528 U.S. 470, 477 (2000) (internal citations and quotations omitted).

A reasonable investigation does not require counsel to "leave no stone unturned." Perry Anthony Cribbs v. State, No. W2006-01381-CCA-R3-PD, 2009 WL 1905454, at *49 (Tenn. Crim. App., at Jackson, July 1, 2009), perm. app. denied (Tenn. Dec. 21, 2009). Rather, "[r]easonableness should be guided by the circumstances of the case, including information provided by the defendant, conversations with the defendant, and consideration of readily available resources." Id. The United States Supreme Court has said, "inquiry into counsel's conversations with the defendant may be critical to a proper assessment of counsel's investigation decisions, just as it may be critical to a proper assessment of counsel's other litigation decisions." Strickland, 466 U.S. at 691.

To succeed on a claim of ineffective assistance of counsel for failure to call a witness at the trial, a petitioner should present that witness at the post-conviction hearing. Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). "As a general rule, this is the only way the petitioner can establish that . . . the failure to have a known witness present or call the witness to the stand resulted in the denial of critical evidence which inured to the prejudice of the petitioner." Id.

Once a petitioner presents a witness at a post-conviction hearing who he claims should have been called at the trial, the post-conviction court must determine whether the testimony would have been (1) admissible at the trial and (2) material to the defense. Pylant v. State, 263 S.W.3d 854, 869 (Tenn. 2008). The court is justified in finding that counsel was not deficient by failing to call a witness if it determines that the witness's testimony would have been inadmissible at the trial or that, even if admissible, would not have materially aided the

petitioner's defense at the trial.  Id.  If the proffered testimony is both admissible and material, the post-conviction court must access the credibility of the witness.  Id. at 869-70.

### 1.  Petitioner's Obtaining the Gun

Fred Nesbit, Jr., testified that on the night before the shooting, he went to the motel where Ashley Nesbit lived and sold drugs and that he attempted to take a gun away from Ashley, who was using drugs at the time.  When he was unsuccessful, he asked Petitioner to watch Ashley.  Mr. Nesbit said that he never knew Petitioner to own or carry a gun and that Petitioner was not familiar with guns.  Although he did not know if Petitioner took the gun from Ashley before leaving the motel, he said that if Petitioner took the gun, it was after Ashley fell asleep.  He said Ashley was the only person who could have provided a gun to Petitioner.  He was never contacted by trial counsel.

As noted by the post-conviction court, however, Petitioner testified at the trial that he had taken the gun from Ashley because police officers were in the area searching for a suspect in an unrelated matter and that he did not want the officers to find the gun on Ashley. The testimony of Fred somewhat contradicted Petitioner's testimony and established Petitioner's association with a drug dealer who also used drugs and carried a firearm.  The post-conviction court found this testimony was not material to Petitioner's defense.  We agree and conclude that trial counsel were not ineffective in failing to present such testimony at the trial.

### 2.  Petitioner's Possession of the Gun on the Morning of the Victim's Death

Quinton Curry testified that he saw Petitioner and the victim embracing at approximately 8:00 to 9:00 the morning of the shooting, that Petitioner allowed him to fire one shot from the gun in Petitioner's possession, and that he heard a second shot when he began to leave Pershing Park Apartments minutes later. James Shaw testified that on the day of the shooting, he heard two gunshots, one in the morning and one in the afternoon.  Mr. Shaw said that after hearing the first gunshot, he looked outside and saw Quinton Curry giving the gun to Petitioner.

The post-conviction court discredited Mr. Shaw and questioned Mr. Curry's credibility and competence to testify.  The evidence at the trial established the victim was alive at 1:00 p.m. when the victim's sister came by her apartment. The victim was killed, and Petitioner left the scene around 3:00 p.m.  Mr. Curry's testimony that he fired the gun at approximately 8:00 to 9:00 a.m. and heard a second gunshot shortly thereafter is, thus, inconsistent with this evidence.  There is no evidence that Petitioner told trial counsel about Mr. Curry or the events leading up to the shooting.  Ms. Glenn testified that Petitioner did

not identify witnesses in addition to those she interviewed and that those witnesses did not identify any additional witnesses.

At the trial, Petitioner testified that he brought the gun to the victim's house, unloaded it, and placed the bullets on top of the refrigerator. He said that he did not wake until 10:00 the next morning and that he and the victim talked until her sister came by the apartment at 1:00 p.m. The only time Petitioner mentioned the gun being moved from the refrigerator was when the victim's sister stopped by the victim's apartment at 1:00 p.m. Petitioner stated that the victim put the gun in a cabinet.

The post-conviction court noted that after Petitioner unloaded the gun the night before the shooting, he would have needed to load one bullet into the gun the next morning to allow Quinton Curry to fire it. The court found this evidence would have called into question Petitioner's testimony that he miscounted when unloading the gun and mistakenly left one bullet in the gun. We conclude there is not a reasonable probability that the result of the trial would have been different with the testimony of Quinton Curry. Petitioner is not entitled to relief on this claim.

### 3. Petitioner's Actions and Statements Following the Shooting

At the post-conviction hearing, Mr. Shaw and Cynthia Nesbit testified that Petitioner told them the shooting was accidental. The post-conviction court, however, refused to credit their testimony, finding that they were "extremely biased," exhibited "selective memor[y]," and made untrue statements. Evidence that Petitioner told Mr. Shaw and Cynthia Nesbit the shooting was an accident was introduced at the trial through Mr. Shaw. Mr. Shaw also testified at the trial about his and Petitioner's efforts to return the gun to the scene.

Petitioner cites to Patrick Nesbit's testimony that he drove Petitioner back to Pershing Park Apartments following the shooting and that Petitioner willingly turned himself in to the police. Evidence of Petitioner's initial cooperation with the police was introduced at the trial through Mr. Shaw, who testified that Petitioner did not resist when the police stopped them and took Petitioner into custody. The post-conviction court properly denied relief on this claim.

### 4. Petitioner's Actions Toward the Victim Before the Shooting

At the post-conviction hearing, Petitioner presented the testimony of Koete Brown, Kareem Curry, and Tracey Davis that Petitioner and the victim acted friendly before the shooting. Petitioner argues the testimony of each witness supported his defense of an accidental shooting.

Mr. Brown testified that he and Petitioner went to the victim's apartment the day before the shooting, that the victim did not act as though she was afraid of Petitioner, and that the victim and Petitioner acted normal. Kareem Curry testified that he saw Quinton Curry engaged in a friendly conversation with the victim and Petitioner between 11:00 a.m. and noon the day of the shooting. He said that the victim and Petitioner stood close together and that he had the impression that they were "boyfriend and girlfriend or something like that." Although this evidence is favorable to Petitioner's defense, there is no evidence that Petitioner identified Mr. Brown or Kareem Curry to the defense team as possible witnesses. Likewise, Petitioner did not testify at the trial that anyone accompanied or visited him at the victim's apartment the day before the shooting or that he and the victim spoke with Quinton Curry the morning of the shooting.

Before the trial, trial counsel unsuccessfully attempted to interview Ms. Davis on several occasions. She was interviewed by the defense team when she arrived to testify at the trial. According to Ms. Glenn's notes of the interview, Ms. Davis said that she and the victim were "very close friends" and that she was unaware of any problems between the victim and Petitioner. Ms. Davis also told Ms. Glenn that various neighbors reported seeing them "all hugged up" and "lovey-dovey" on the day of the shooting. At the post-conviction hearing, Ms. Davis testified that on the morning of the shooting, she saw the victim and Petitioner "hugged up." Ms. Davis said that the victim liked Petitioner and that they were getting along and that the victim never said she was afraid of Petitioner.

Although trial counsel interviewed Ms. Davis before her testimony at the trial, the record shows she was quickly interviewed moments before she took the stand. Counsel never questioned Ms. Davis during the interview or during her testimony about her observations the morning of the victim's death. Evidence that Petitioner and the victim were friendly toward each other the morning before the shooting supported the defense's theory of an accidental shooting. We conclude, therefore, that counsel were deficient by failing to present such proof. We acknowledge that this evidence strengthens Petitioner's claim that he accidentally shot the victim when combined with Dr. Hudson's testimony that Petitioner's explanation of the shooting at the trial was consistent with the gunshot wound. Ms. Davis's testimony, however, is insufficient to establish prejudice in light of the evidence regarding the burns and bruises on the victim.

At the trial, Dr. Smith testified that the burn under the victim's chin had a small blister and carbonaceous deposits or soot-like material, which indicated that the source of the burn was "probably a flame . . . as opposed to a heat source." A photograph of the burn on the victim's neck showed a burn in the shape of the number "1." Dr. Smith said the burns were inflicted within two to several hours before the victim's death, which went unrebutted at the trial. Dr. Smith also testified that the bruising on the victim's feet were "less than several

-60-

hours old" and "probably . . . within four to six hours prior to her death." He described the soles of a person's feet as having some of the thickest and toughest skin on the body. He said "a fairly rigid type of instrument" would be required to produce the type of bruises on the victim's feet. Although Dr. Smith was unable to identify the specific instrument that caused the bruising, he said "the characteristics of the weapon would be something thin with an edge, such as a rod or a bar of some type."

The post-conviction court found no credible evidence that the burns were self-inflicted through the careless use of a curling iron or that the bruises were caused by the victim's shoes. As found by the post-conviction court, the photograph of the burn on the victim's neck in the shape of the number "1" dispelled any claim that the burns were random in nature. Petitioner did not testify that the burns and bruises were self-inflicted or otherwise accidental. Rather, Petitioner claimed no knowledge of the injuries despite evidence that the injuries occurred during the time period in which he was with the victim. Although Petitioner claimed at the trial that he did not see the burns, Constance Cannon testified that approximately two hours before the victim's death, she saw a horizontal line on the victim's neck that had not been visible the day before the shooting.

Although Ms. Davis testified that Petitioner and the victim appeared friendly the morning before the shooting, she also said she heard crying from the victim's apartment for one to one and one-half hours that afternoon before she discovered the victim's body. When asked if she heard adults crying or screaming, she said, "Not that I know of. I just heard crying. I couldn't distinguish if it was a child or an adult." She acknowledged her trial testimony that she heard children crying. Even if the defense had presented evidence at the trial that the Defendant and the victim were seen embracing the morning of the shooting, we cannot conclude from this evidence that there is a reasonable probability that the jury verdict would have been different. The jury was presented with Petitioner's multiple versions of how the shooting occurred and Dr. Smith's testimony about the victim's injuries and how they were inflicted. Given this evidence, we conclude that trial counsel's failure to present evidence of the friendly demeanor between Petitioner and the victim did not result in prejudice.

### D. Failure to Interview Family and Friends About Petitioner's Character

Petitioner contends that counsel were ineffective by failing to interview witnesses that could have negated the State's allegation that Petitioner was involved in satanic worship, including Oscar Jones, Joan Jahi, Constance Branch, Ernestine Branch, Ophelia Jones, Velma Cowens, and Louise Cowens. Petitioner argues that had trial counsel interviewed these witness and called them to testify at the trial, the testimony would have negated the allegation. This issue is fully addressed below.

### E. Failure to Investigate the Victim

Petitioner contends that counsel were ineffective by failing to present testimony about the victim's drug use, instances in which she burned herself with a curling iron, and the victim's wearing shoes that caused her feet to hang over the back of the shoes.

Trial counsel testified that although a curling iron was found at the scene, the defense team did not attempt to locate and interview witnesses about the victim's possible history of burning herself with a curling iron. Counsel also did not investigate the victim's drug use or her wearing shoes too small for her feet. He said Petitioner did not tell counsel the victim used drugs. He agreed that information that the victim wore shoes that caused her feet to hang off the back edge would have been relevant to explain the bruises on the bottom of her feet. He said that had he known this information, he would have presented it to the jury.

James Shaw and Cynthia Nesbit both testified that they saw the victim's feet hang over the back of her shoes and saw her smoke marijuana. The post-conviction court, however, discredited both witnesses and found that because the victim's toxicology analysis was negative for drugs or alcohol, evidence of the victim's drug use was irrelevant and inadmissible. Tracey Davis testified that the victim smoked cigarettes and that she saw a burn on the victim's ear from a curling iron on one occasion in 1992 when she and the victim lived at Robinhood Apartments.

Dr. Hudson was unable to provide the specific cause of the burns on the victim's body and agreed that reckless use of a curling iron could have caused the burns. Dr. Hudson also provided additional causes that were consistent with the burns found on the victim's chin. Photographs of the victim's neck showed a burn in the shape of a number "1," which the post-conviction court found contradicted Dr. Hudson's description of the burns as "random."

Dr. Hudson testified that discoloration on the victim's feet could have been caused from wearing shoes or an "irregularity in the inner surface of the shoes." He said it was conceivable that the foot markings were caused by a pair of clogs that were too small and caused the feet to hang over the back of the shoe. He also testified that a least one of the photographs depicting the victim's injuries on her feet was consistent with Dr. Smith's testimony at trial that the victim was beaten on the bottom of her foot with a long, hard, thin object. The post-conviction court found that Dr. Hudson did not contradict Dr. Smith's trial testimony.

Although we agree with the post-conviction court's conclusion that the victim's drug use was inadmissible based on the negative toxicology results, we conclude that counsel were deficient by not investigating the victim. There is no evidence that counsel investigated the

victim in any aspect or made a reasonable decision as to why the victim should not have been investigated. Likewise, there is no evidence that counsel questioned the witnesses who testified at the trial, or potential witnesses who did not testify at the trial, about the victim's history of burning herself with a curling iron, wearing shoes that were too small for her feet, or her using drugs.

The post-conviction court, however, discredited Mr. Shaw and Cynthia Nesbit and found that Ms. Davis saw the burn on the victim's ear one year before the shooting. Petitioner's own trial testimony thwarted efforts to establish at the post-conviction hearing that the victim's burns were self-inflicted while curling her hair with a curling iron. Petitioner testified at the trial that he was with the victim from 3:00 a.m. until the victim's death, but that he did not know how the victim came to be burned and denied seeing any burns on the victim. By being with the victim for a number of hours before her death, Petitioner would be in the best position to know how the burns were inflicted. His assertion of lack of knowledge undermined his credibility and any attempts to link the victim's burns to an accident with a curling iron. Trial counsel were not ineffective in failing to present any such evidence at trial.

### F. Failure to Object to and Rebut Allegations of Satanic Worship

Petitioner contends that counsel were ineffective by failing to object to the claim that Petitioner was involved in devil worshiping. Specifically, Petitioner contends counsel were ineffective (1) by opening the door to allow the State to question Mr. Shaw about Petitioner's alleged involvement in satanic worship; (2) by not objecting to the State's line of questioning on the grounds of Tennessee Rule of Evidence 608 and various constitutional principles; and (3) by not investigating or preparing witnesses to testify about Petitioner's character and his not engaging in satanic worship.

### 1. Opening the Door

Trial counsel testified that he was aware of the satanic worship allegation before the trial but that he did not believe the post-conviction court would allow the State to question witnesses about it. He agreed that Mr. Shaw's testimony was damaging and that he was not prepared to refute an allegation of satanic worship. He agreed that he did not file a pretrial motion seeking to exclude evidence of satanic worship and that evidence Petitioner attended church regularly could have helped to rebut the State's allegation.

Trial counsel knew about the satanic worship allegation before the trial but did nothing to address the issue and was unprepared to rebut the allegation at the trial. Deference is only made to trial strategy and counsel's tactical choices when they are informed decisions

based on adequate preparation. See Hellard, 629 S.W.2d at 9. There is no evidence showing counsel made an informed decision based on adequate preparation to do nothing regarding the allegation. Although counsel thought the allegation was inadmissible, he questioned Mr. Shaw about Petitioner's reputation for peacefulness. Furthermore, there is no evidence showing that counsel made the tactical decision or weighed the consequences of questioning Mr. Shaw about Petitioner's reputation for peacefulness while knowing about the satanic worship allegation. We conclude that counsel was deficient because his decisions were not based on adequate preparation.

Mr. Shaw testified, however, that he did not believe the allegation and that it did not change his opinion of Petitioner. No additional witnesses were questioned at the trial about the allegation, and neither party mentioned the allegation during closing arguments. The allegation was not admitted as substantive evidence but was admitted for the limited purpose of evaluating Mr. Shaw's credibility. See Nesbit, 978 S.W.3d at 881-85; see also Tenn. R. Evid. 405. The post-conviction court charged the jury as to the limited use of the evidence during Mr. Shaw's testimony and the final jury charge. Petitioner has failed to establish that this deficiency resulted in prejudice.

## 2. Failing to Offer Proper Objections

At the trial, trial counsel objected to the State's questioning Mr. Shaw about the satanic worship allegation as improper pursuant to Tennessee Rule of Evidence 405. Petitioner argues counsel should have also objected pursuant to Tennessee Rule of Evidence 608(b). Rule 608(b) allows a party to cross-examine a witness about specific instances of conduct that are probative of truthfulness or untruthfulness of the witness who is testifying or another witness about whom the character witness is testifying. Tenn. R. Evid. 608(b). The State did not seek to question Mr. Shaw about the allegation in an attempt to impeach him for the purposes provided in Rule 608(b). Rather, the State sought to impeach Mr. Shaw's testimony about Petitioner's reputation for peacefulness and quietude pursuant to Tennessee Rule of Evidence 405. See Nesbit, 978 S.W.2d at 884. Even if the line of questioning was not permissible under Rule 608(b), it was permissible pursuant to Rule 405. Counsel, therefore, were not deficient by failing to object to the questioning on the basis of Tennessee Rule of Evidence 608(b).

Petitioner also contends counsel were ineffective by failing to object to the State's questioning as a violation of his due process rights under the Fifth and Fourteenth Amendments of the United States Constitution and Article I, section 8 of the Tennessee Constitution, a violation of his right to present a defense under the Sixth Amendment and Article I, section 9 of the Tennessee Constitution, and a violation of his rights under the Confrontation Clause of the Sixth Amendment and Article I, section 9 of the Tennessee

Constitution. Petitioner asserts trial counsel did not argue that "the introduction of such evidence would constitute a manifest injustice in the circumstances of this media climate." Petitioner fails to argue or cite to any case law in his brief with regard to whether the State's questioning violated these provisions. These issues are without merit.

### 3. Failing to Investigate and Present Witnesses

Petitioner contends counsel were ineffective by failing to question Mr. Shaw further about the source of the satanic worship allegation and by failing to call Cynthia Nesbit as a witness to testify about the source of the allegation. Petitioner argues that further questioning would have shown the sources of the allegation as the prosecutor and the victim's grieving family and would have lessened its impact. Petitioner identifies multiple witnesses who testified at the post-conviction hearing that Petitioner attended church and faults counsel for failing to present these witnesses to rebut the allegation of satanic worship.

The post-conviction court discredited Mr. Shaw and Cynthia Nesbit and found Cynthia Nesbit "obviously lied" when she first testified that she never told Mr. Shaw about the satanic worship allegation and implied that the story came from the prosecutor. After continued questioning, she admitted that she told Mr. Shaw about the allegation and that the source of the allegation was the victim's family.

Petitioner presented the following witnesses to show that he was involved in church and to rebut the allegations of satanic worship: Oscar Jones, Joan Jahi, Constance Branch, Ernestine Branch, Ophelia Jones, Velma Cowens, and Louise Cowens. Although these witnesses testified that Petitioner attended church, Petitioner did not provide counsel with the name of a pastor or witnesses with whom he attended church. Trial counsel acknowledged that if he had introduced evidence that Petitioner was a good Christian, he could have reopened the door to the allegation of satanism. Instead, following the State's questioning, counsel elicited testimony from Mr. Shaw that he did not believe the allegation and that the allegation did not change his opinion of Petitioner. The allegation was not mentioned by other witnesses or in the parties' closing arguments. The allegation was admitted for the limited purpose of evaluating Mr. Shaw's credibility. Petitioner has not established prejudice and is not entitled to relief on this issue.

### G. Failure to Prepare for Dr. O.C. Smith's Testimony

Petitioner contends that counsel were ineffective by failing to prepare properly for Dr. Smith's testimony. Petitioner argues that counsel were ineffective by failing (1) to interview Dr. Smith before the trial and (1) to obtain an expert witness to refute Dr. Smith's testimony.

### 1. Failure to Interview Dr. O.C. Smith Before the Trial

Petitioner argues that trial counsel failed to interview Dr. Smith before the trial. The post-conviction court credited trial counsel's testimony that he interviewed Dr. Smith before the trial and that they discussed the victim's gunshot wound, bruises and burns, and falanga. This issue is without merit.

### 2. Failure to Obtain an Expert Witness to Refute Dr. O.C. Smith's Testimony

Petitioner contends that counsel were ineffective by failing to retain a forensic pathologist to rebut Dr. Smith's findings. While Dr. Hudson offered testimony addressing the victim's burns and bruises and the path of the gunshot wound, Petitioner focuses only on the burns and bruises.

The post-conviction court correctly noted Dr. Hudson basically agreed with Dr. Smith's analysis but included phrases in his testimony such as "could have been," "possible," and "conceivable." Dr. Hudson admitted that the photographs upon which he relied were not of the highest quality and that he was at a disadvantage because he did not have the opportunity to view the victim's body and wounds firsthand.

Dr. Hudson was unable to provide a specific cause for the burns on the victim's body. He testified he did not identify any evidence from the scene other than the curling iron that would have reasonably caused the burns. While Dr. Hudson said the burn on the victim's chin was not necessarily caused by an open flame as testified at the trial by Dr. Smith, he acknowledged the burn could have been caused by a heated object with a form of carbon coating, such as a match that had been lit and then extinguished or a curling iron with salve on it.

Dr. Hudson's testimony does not demonstrate that the burns were self-inflicted, as argued by Petitioner. Dr. Hudson testified only that a person who uses a curling iron in a reckless manner could have inflicted the wounds. Dr. Hudson acknowledged that the victim's drug and alcohol screen was negative and that it was unlikely that the victim was using her curling iron while intoxicated within hours of her death. The post-conviction court refused to accredit the testimony of Cynthia Nesbit and Mr. Shaw that they previously had seen the self-inflicted burns on the victim from a curling iron resulting from accidents while curling her hair. While Dr. Hudson described the burns as "random," the post-conviction court found that the photographs of the neck wounds, showing burns on the side of the neck in the shape of a number "1," would have dispelled the idea that the burns were random in nature. Finally, Petitioner did not assert at trial that the victim's wounds were self-inflicted.

Rather, he denied any knowledge as to how the victim was burned or seeing the burns even though Petitioner was with the victim for a number of hours before her death.

Dr. Hudson testified he was unable to determine whether the victim's left foot was bruised or beaten from the photographs or slide. He did note markings on the victim's right foot. While Dr. Hudson stated a faint yellow green color on the victim's right foot could have been an older bruise, he also stated it could have been a poor reproduction of the photograph.

While Petitioner on appeal focuses upon Dr. Smith's testimony regarding falanga, Dr. Smith did not use this particular term or describe this method of torture until the penalty phase, which is not at issue in this appeal. Rather, at the trial, Dr. Smith testified that although he could not identify what specific weapon caused the bruising, "the characteristics of the weapon would be something thin with an edge, such as a rod or a bar of some type, a material that would be rigid enough to go across the sole of the feet." Nevertheless, Dr. Hudson testified that at least one of the photographs he reviewed showed bruising consistent with falanga.

Finally, Dr. Hudson was unable to give an opinion within a reasonable degree of medical certainty as to whether the victim was tortured. As noted by the post-conviction court, Dr. Hudson did not contradict Dr. Smith's findings. Accordingly, Petitioner has failed to present facts establishing that counsel were ineffective in not retaining a forensic pathologist and presenting the doctor's testimony in the guilt phase.

## H. Failure to Object to and Request Jury Instructions

Petitioner contends that counsel were ineffective by failing (1) to object to the jury instruction on burden of proof; (2) to object to the jury instruction on flight; (3) to request a jury instruction on ignorance or mistake of fact; and (4) to request a jury instruction on negligent homicide.

### 1. Burden of Proof

Petitioner contends that counsel were ineffective by failing to request a proper instruction on the burden of proof. Petitioner argues the appropriate jury charge on the burden of proof was as follows:

> [T]he [S]tate has the burden of proving the guilt of the defendant beyond a reasonable doubt, and this burden never shifts but remains on the

[S]tate throughout the trial of the case.  The defendant is not required to prove his innocence.

T.P.I. Crim. 2.02.

At the trial, the trial court charged the jury as follows:

PRESUMPTION OF INNOCENCE

You enter upon this investigation with the presumption that the defendant is not guilty of any crime, and this presumption stands as a witness for him until it's rebutted and overturned by competent and credible proof.

It is, therefore, incumbent upon the State, before you can convict the defendant, to establish to your satisfaction, beyond a reasonable doubt, that the crime charged in the indictment has been committed, and that the same was committed within the County of Shelby and the State of Tennessee before the finding of this indictment, and that the defendant at bar committed the crime in such manner that would make him guilty under the law heretofore defined and explained to you.

Before opening statements, the court instructed the jury "that the defendant is presumed innocent until proven guilty by clear, credible, and competent proof beyond a reasonable doubt and to a moral certainty."

The post-conviction court found that counsel were not ineffective by failing to object to the trial court's jury instruction on reasonable doubt.  The court found that the jury instruction was a correct statement of law on reasonable doubt and moral certainty. We agree with the post-conviction court.  "The beyond a reasonable doubt standard is a requirement of due process, but the Constitution neither prohibits trial courts from defining reasonable doubt nor requires them to do so as a matter of course."  Victor v. Nebraska, 511 U.S. 1, 5 (1994).  As "long as the court instructs the jury on the necessity that the defendant's guilt be proved beyond a reasonable doubt, . . . the Constitution does not require that any particular form of words be used in advising the jury of the government's burden of proof."  Id. (citations omitted).  We conclude that the trial court "sufficiently described the degree of doubt necessary for acquittal and the degree of proof necessary for conviction."  See Pettyjohn v. State, 885 S.W.2d 364, 365 (Tenn. Crim. App. 1994).  Counsel were not ineffective by failing to request the pattern jury instruction or by failing to object to the trial court's instruction.

## 2. Flight

Petitioner contends that counsel were ineffective by failing to object to the jury instruction on flight. Trial counsel, however, did object to the instruction at the trial. The record shows that a bench conference was held before the trial court charged the jury. Counsel objected to the flight instruction on the ground that Petitioner was not evading arrest. The court overruled the objection and charged the jury accordingly. Petitioner raised the issue on direct appeal, and this court concluded that the trial court did not err by instructing the jury as to flight. See Nesbit, 978 S.W.3d at 900. The issue is without merit.

## 3. Ignorance or Mistake of Fact

Petitioner contends that counsel were ineffective by failing to request an instruction on ignorance or mistake of fact. "[I]gnorance or mistake of fact is a defense to prosecution if the ignorance or mistake negates the culpable mental state of the charged offense." Tenn. Code Ann. § 39-11-502(a) (2010). Ignorance or mistake of fact is a "narrow defense." Tenn. Code Ann. § 39-11-502, Sentencing Comm'n Cmts.

In criminal cases, the trial court must give "a complete charge of the law applicable to the facts of the case and the defendant has a right to have every issue of fact raised by the evidence and material to his defense submitted to the jury upon proper instructions by the judge." State v. Thompson, 519 S.W.2d 789, 792 (Tenn. 1975); see Tenn. Code Ann. § 39-11-203(c), (d) (entitling a defendant to have the issue of the existence of a defense submitted to the jury if fairly raised by the proof). "In determining whether a defense is raised by the evidence, the court must examine the evidence in the light most favorable to the defendant to determine whether there is evidence that reasonable minds could accept as a defense." State v. Sims, 45 S.W.3d 1, 9 (Tenn. 2001) (citing Johnson v. State, 531 S.W.2d 558, 559 (Tenn. 1975); State v. Bult, 989 S.W.2d 730, 733 (Tenn. Crim. App. 1998)). A jury instruction must be reviewed in its entirety and read as a whole rather than in isolation. State v. Leach, 148 S.W.3d 42, 58 (Tenn. 2004). An instruction should be considered prejudicially erroneous only if the jury charge, "when read as a whole, fails to fairly submit the legal issues or misleads the jury as to the applicable law." State v. Forbes, 918 S.W.2d 431, 447 (Tenn. Crim. App. 1995).

Petitioner was charged with and convicted of premeditated first degree murder, which was defined at the time of the victim's death as "an intentional, premeditated and deliberate killing of another." Tenn. Code Ann. § 39-13-202 (1991). A person acts intentionally "with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result." Tenn. Code Ann. § 39-11-302(a) (2010).

At the trial, Petitioner testified that he believed he removed all of the bullets from the gun and that the gun fired as he was "fumbling" with it. He admitted he did not exercise care in unloading the gun and left one bullet in the gun unintentionally. Petitioner's theory at the trial was that he was mistaken in his belief that the gun was unloaded and that he did not intend to shoot the victim. In viewing this evidence in a light most favorable to Petitioner, we conclude that reasonable minds could accept ignorance or mistake of fact as a defense to premeditated first degree murder. Counsel were deficient by failing to request a jury instruction on ignorance or mistake of fact.

The defense presented proof at trial that Petitioner mistakenly believed that the gun was unloaded and that he did not intend to shoot the victim. During his opening statement, trial counsel stated that Petitioner shot the victim but that "it was not with premeditation, it was not with deliberation, and it was not intentional." During closing arguments, trial co-counsel again argued that Petitioner believed that the gun was unloaded and that the shooting was accidental. She further argued that the shooting did not constitute first degree murder in that the killing was not premeditated, deliberate, and intentional. She read to the jury the elements of second degree murder, voluntary manslaughter, and reckless homicide as lesser included offenses. The jury rejected the argument and proof presented by the defense and convicted Petitioner of the premeditated and intentional first degree murder of the victim. By doing so, the jury rejected ignorance or mistake of fact as a defense. Under these circumstances, we cannot conclude that there was a reasonable probability that the jury would have reached a different result had they been instructed on ignorance or mistake of fact.

### 4. Criminally Negligent Homicide

Petitioner contends that counsel were ineffective by failing to request a jury instruction on criminally negligent homicide as a lesser included offense of first degree murder. The record shows that counsel did request a jury instruction on criminally negligent homicide, which the trial court denied. We conclude Petitioner is not entitled to relief on this issue.

### II. ADMISSION OF MR. MASSEY'S TESTIMONY

The State contends that the post-conviction court abused its discretion by permitting William Massey to testify as an expert witness on the prevailing professional standards of attorneys in death penalty litigation. The State argues that expert testimony from an attorney cannot substantially assist a post-conviction court, as trier of fact, in post-conviction proceedings.

Questions about the qualifications, admissibility, relevancy, and competency of expert testimony generally are left to the discretion of the trial court. State v. Howell, 185 S.W.3d 319, 337 (Tenn. 2006). We will not overturn a trial court's decision to admit or exclude expert testimony unless the trial court abuses its discretion. Id. A trial court abuses its discretion "by applying an incorrect legal standard or reaching an illogical or unreasonable decision that causes the complaining party to suffer injustice." Id.

Admissibility of expert testimony in Tennessee is governed in part by Tennessee Rule of Evidence 702, which provides that "if scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify in the form of an opinion or otherwise." The admissibility of expert testimony pursuant to Rule 702 is more stringent than under the federal rule. Howell, 185 S.W.3d at 337. Federal Rule of Evidence 702 requires that the testimony "assist the trier of fact," while the Tennessee Rule requires that the testimony "substantially assist the trier of fact." Thus, "the probative force of the testimony must be stronger before it is admitted in Tennessee." McDaniel v. CSX Transp., Inc., 955 S.W.2d 257, 264 (Tenn. 1997).

In determining whether counsel's performance was deficient, "[n]o particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel." Strickland, 466 U.S. at 688-89. A trial court may examine any number of sources to determine whether counsel's performance was reasonable in light of the "[p]revailing norms of practice." Id. at 688. While expert testimony is not necessary to establish ineffective assistance of counsel, it is one more source of evidence that a court may consider in its determination of the issue.

The Tennessee Supreme Court addressed the issue of an attorney testifying as an expert in post-conviction proceedings in State v. Howell. The court concluded that the trial court did not abuse its discretion by excluding such expert testimony based upon the trial court's finding that it did not need the assistance of an expert to determine whether counsel was ineffective and that the attorney's testimony would not substantially assist the trier of fact. Howell, 185 S.W.3d at 338. The court, however, did not conclude that such expert testimony would never be admissible. Rather, the court based its holding on an evaluation of the principles provided in Tennessee Rule of Evidence 702 and McDaniel. Id. Likewise, we are not prepared to conclude that expert testimony from an attorney will never substantially assist the post-conviction court in determining whether a petitioner was afforded the effective assistance of counsel. For instance, an attorney expert witness could possibly provide testimony as to whether available resources and/or time constraints in the trial court would permit or preclude trial counsel's investigation and preparation that a petition alleges should have been done. The decision to admit expert testimony is left to the discretion of the

post-conviction court based upon the circumstances of the case and its application to the rules of evidence and the applicable case law.

The post-conviction court stated that it was not an expert and that under the rules of evidence, Mr. Massey had "a special skill or experience that would allow him to testify and give his opinions." The court found that Mr. Massey would substantially assist the court in its determination of whether counsel were ineffective. The State is not entitled to relief.

The State also contends that the post-conviction court abused its discretion by admitting the testimony because Mr. Massey offered opinions as to the ultimate issue of whether trial counsel were ineffective. Tennessee Rule of Evidence 704 provides that "[t]estimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." Because the post-conviction court found the testimony would substantially assist the court, it was "otherwise admissible" and not objectionable because it embraced an ultimate issue. The post-conviction court did not abuse its discretion by allowing Mr. Massey to testify.

## III. CUMULATIVE ERROR ANALYSIS

We now address the cumulative impact of counsel's deficient actions that do not in isolation give rise to prejudice and a deprivation of due process under Strickland. The cumulative error doctrine stands for the proposition that relief must be granted when there are "multiple errors committed in the trial proceedings, each of which in isolation constitutes mere harmless error, but which when aggregated, have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial." State v. Hester, 324 S.W.3d 1, 76-77 (Tenn. 2010) (internal citations omitted).

Our supreme court has stated that "'the combination of multiple errors may necessitate the reversal . . . even if individual errors do not require relief.'" State v. Jordan, 325 S.W.3d 1, 79 (Tenn. 2010) (quoting State v. Cribbs, 967 S.W.2d 773, 789 (Tenn. 1998)). This court has stated, "when an attorney has made a series of errors that prevents the proper presentation of a defense, it is appropriate to consider the cumulative impact of the errors in assessing prejudice." Timothy Terell McKinney v. State, W2006-02132-CCA-R3-PD, 2010 WL 796939, at * 37 (Tenn. Crim. App., at Jackson, Mar. 9, 2010) (citing Harris ex rel Ramseyer v. Wood, 64 F.3d 1432, 1438 (9th Cir. 1995), cert. denied, 490 U.S. 1075 (1989) (citations omitted)), perm. app. denied (Tenn. Aug. 25, 2010). This court has also stated that counsel's failure to conduct adequate pretrial preparation and investigation may suffice for a showing of prejudice. Id. "The reviewing court does not ask as to whether the defendant is innocent

of the crime. The question remains whether the defendant was deprived of a reasonable chance of acquittal due to his counsel's performance." Id.

Counsel's deficiencies at trial relate to the failure to convey the plea offer in a timely manner, the failure to present evidence that the Petitioner and the victim were "hugged up" on the morning prior to the shooting, the failure to present evidence challenging the cause and source of the victim's burns and bruises and to investigate her character, the failure to prevent testimony regarding devil worship, and the failure to request a jury instruction on ignorance or mistake of fact. We cannot conclude that these deficiencies, when considered alone or cumulatively, resulted in prejudice in light of the other evidence presented at trial.

Although trial counsel should have conveyed the plea offer in a timely manner, Petitioner presented no credible evidence that he would have accepted the plea and not demanded a trial had he learned of the plea offer sooner. Although trial counsel failed to request a jury instruction on ignorance or mistake of fact, the defense presented proof at trial that Petitioner mistakenly believed that the gun was unloaded and that he did not intend to shoot the victim. Trial counsel argued ignorance or mistake of fact to the jury, and the jury rejected the argument. Evidence of devil worship was not admitted as substantive evidence to establish that the shooting was not accidental and that Petitioner was guilty of premeditated first degree murder. Rather, the evidence was admitted for the limited purpose of impeaching Mr. Shaw's credibility, and the trial court instructed the jury to this limited purpose.

Petitioner argues that evidence of an alternative cause for the victim's burns and bruises also would have supported his testimony that the shooting was accidental. The only credible evidence presented regarding an alternative cause for the burns and bruises was through Dr. Hudson. As we previously discussed, however, Dr. Hudson's testimony did not establish that the burns were self-inflicted and did not contradict Dr. Smith's findings regarding falanga. Furthermore, as stated above, the term "falanga" was never mentioned in the guilt phase, the only phase that is pertinent to this appeal. Dr. Hudson's testimony that the burns were accidental and random was inconsistent with photographs of the burns, including a photograph showing a burn in the shape of the number "1." While the victim may have had a history of drug use, this evidence would not have been admissible at trial to support any claim that the burns were caused by the victim while using a curling iron in an intoxicated state because her toxicology results were negative. Moreover, Petitioner, who was with the victim all day and would have noticed the burns and heard any complaints from the victim about them, did not testify that the burns were self-inflicted and accidental, but claimed no knowledge of the burns. Ms. Cannon, who saw the victim for only a short time that day, noticed the line on the victim's neck. Evidence that Petitioner and the victim were "hugged up" on the morning before the shooting would have supported Petitioner's testimony

that the shooting was accidental.  In light of the evidence of the victim's injuries, however, there is no reasonable probability that the admission of evidence that Petitioner and the victim were "hugged up" on the morning before the shooting that occurred later that afternoon would have resulted in a different verdict.

## CONCLUSION

In consideration of the foregoing and the record as a whole, we affirm the judgment of the post-conviction court denying Petitioner post-conviction relief as it relates to the guilt phase of the trial.

_____
THOMAS T. WOODALL, JUDGE